[L.A. No. 30112. In Bank. July 16, 1973.]

NEIL R. LEWIS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## Counsel

Neil R. Lewis, in pro. per., for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law for a period of one year.

Petitioner was admitted to practice in this state on September 11, 1962. He testified that, in addition, he was a real estate broker and a general contractor and had been in the construction business since 1955.

During 1962, Herbert Ratcliffe, a pilot for Western Airlines, met petitioner through another pilot, William Schultz, who was also an attorney and was associated with petitioner. Mr. Ratcliffe and his wife owned a 1½-acre unencumbered parcel of real property at 2080 West 264th Street in Lomita, California (hereinafter referred to as "the Lomita parcel"), worth about $40,000.

In September 1962, petitioner, the Ratcliffes, and Schultz formed a limited partnership known as Lomita Pines Development Company (hereinafter referred to as "Lomita Pines"), with petitioner as the only general partner and the Ratcliffes and Schultz as limited partners. Under the terms of the partnership agreement, the Ratcliffes agreed to convey the Lomita parcel to Lomita Pines for $40,000, secured by a "subordinated deed or deeds of trust" recorded concurrently with, and junior only to, a first deed of trust for construction financing. It was proposed that the Lomita parcel be divided into lots and new homes constructed thereon; and the agreement provided that the Ratcliffes could exchange their beneficial interest in the subordinated trust deed for one of the lots, with a home thereon, of equal value.

Petitioner, as the general partner, was to manage the partnership business and deposit all funds received by him in connection with Lomita Pines in a special bank account. Any net profits were to be divided, as follows: 50 percent to the Ratcliffes, 25 percent to petitioner, and 25 percent to Schultz. Unless otherwise agreed in writing, the Ratcliffes, as limited partners, were not to be liable for additional contributions. Title to the real property purchased by Lomita Pines was to be held under the partnership name. No part of any partner's interest could be "pledged, mortgaged, sold or assigned in any manner" without the express written consent of a majority of the partnership interest. Likewise, petitioner, as general partner, could not "pledge, mortgage, sell, assign or in any manner voluntarily transfer his interest" except on consent and approval of the majority of the limited partnership interest. At all times during the continuance of the partnership, there were to be kept complete and true books of account

with respect to the partnership business and affairs. Each partner had the right at all reasonable times to examine the partnership books and records and was entitled on demand to have true and full information on all matters affecting the partnership and to have a formal accounting of its affairs.

On October 2, 1962, the Ratcliffes executed a grant deed of the Lomita parcel to Lomita Pines. On November 21, 1962, petitioner executed, in the name of Lomita Pines, as trustor, and in favor of the Ratcliffes, as beneficiaries, a trust deed securing the $40,000 purchase price. The trust deed also recited an agreement between the trustor and the beneficiaries to subordinate the trust deed at a future date to a new construction loan trust deed, payable upon such conditions as were required by the lender making the construction loan. The grant deed from the Ratcliffes and the trust deed in their favor were recorded on December 19, 1962.

In January 1963, the Ratcliffes moved out of their old home on the Lomita parcel and moved into a home in Palos Verdes Estates owned by petitioner. Shortly thereafter, petitioner engaged a civil engineer, obtained permits, employed a contractor, and began rough grading work on the Lomita parcel. The parcel was divided into eight lots for development purposes.

According to Mr. Ratcliffe's testimony, petitioner told the Ratcliffes in March 1963 that in order for him to obtain the necessary construction loan, they would have to reconvey to Lomita Pines the $40,000 trust deed on the Lomita parcel. Mr. Ratcliffe further stated, however, that petitioner represented to them that as soon as he had obtained the construction financing, he would reinstate a second trust deed in the Ratcliffes' favor. The Ratcliffes thereupon executed a request or authorization to reconvey, and on March 29, 1963, a full reconveyance was recorded. On the same day, there were recorded three trust deeds on the Lomita parcel in favor of Belmont Savings and Loan Association, securing the repayment of a total of $109,000 in construction loans.

Petitioner had new residences constructed on four of the eight lots and in January 1964 gave possession to the Ratcliffes of the residence on lot 1. Although the other residences were not sold promptly, petitioner eventually sold the ones on lots 2 and 3 to third persons and later sold the one on lot 4 to Richard Reynolds, another pilot acquaintance of his. Thereafter, lots 5 through 8 were sold as one "parcel" for $50,000.

Some time in January 1964 or later, the Ratcliffes realized that they had not received another trust deed. They had made no inquiries of petitioner with respect thereto, assuming that he would, soon after obtaining

the construction loans, record another trust deed in their favor. According to the Ratcliffes' testimony, they had many discussions with petitioner about the progress of Lomita Pines and were assured that everything was "sweetness and light" and that there was nothing to worry about.

Between March and September 1964, while the Ratcliffes held no trust deed on the Lomita parcel, petitioner used the parcel to secure indebtednesses in the gross sum of $32,550, executing a total of six second trust deeds in favor of five separate creditors. These six trust deeds were recorded between March 24 and September 21, 1964. One of them covered lot 1, on which the Ratcliffes' new home had been built. Mr. Ratcliffe testified that he did not discover that second deeds of trust had been placed on the Lomita parcel until the lots were in foreclosure in the fall of 1964. He further testified that at some time he asked petitioner for an accounting of the Lomita Pines project but never received one. Mrs. Ratcliffe said that petitioner refused to show them the partnership books of account on one occasion when they asked to see them.

*Prior Disciplinary Proceeding Against Petitioner*

On July 12, 1967, this court suspended petitioner from practice for six months, but stayed execution of the suspension and placed him on probation for six months. His misconduct in that proceeding related to his handling of funds received from Mr. Ratcliffe and Mr. Reynolds in March 1965 to cover taxes on their respective lots.[1] The prior proceeding was

---

[1]The evidence in that proceeding showed that in March 1965 petitioner advised both Mr. Ratcliffe and Mr. Reynolds that a single tax bill had been received covering all the lots; and he suggested that they each give him a check for their pro rata share. On or about March 11, 1965, Mr. Reynolds gave petitioner a check for $390, payable to petitioner. Petitioner cashed the check, but failed to deposit the proceeds in any bank account of his own or of Lomita Pines. On the same day, Mr. Ratcliffe gave petitioner a check, payable to the tax collector, for $554.09.

The next day, petitioner gave the tax collector a check for $1,807.73 for real estate taxes, including those owed by Mr. Reynolds; but the check was returned for insufficient funds, and petitioner never made good on the check. He never paid the taxes owing on Mr. Reynolds' lot for the 1964-1965 tax year and caused Mr. Reynolds to incur delinquent penalties and interest on those taxes.

On or about March 26, 1965, petitioner received a warrant from the County of Los Angeles in the sum of $554.09, payable to petitioner, representing a refund of tax money paid by Mr. Ratcliffe. Petitioner cashed the warrant, but never paid the $554.09 either to Mr. Ratcliffe or to the tax collector.

In July 1965, during the State Bar's investigation of the matter, petitioner informed the State Bar by letter that immediately upon receiving a restraining order in a civil action filed by Mr. Ratcliffe against him, he withdrew and separated funds of Lomita Pines in order to comply with the court order. He stated that the result of compliance with the court order was that his check to the tax collector was returned for insuffi-

brought on the complaint of Mr. Reynolds, but Mr. Ratcliffe appeared as a witness therein.

*Present Disciplinary Proceeding Against Petitioner*

In 1967, at the time petitioner was disciplined in the prior proceeding, there was pending against him a civil action filed by the Ratcliffes in the Los Angeles County Superior Court; but the Ratcliffes did not make a complaint to the State Bar with respect to the subject matter of the action until April 17, 1968.

The Ratcliffes' action was filed on April 5, 1965, and was one for fraud, for misappropriation of assets of Lomita Pines, for an accounting of Lomita Pines' receipts, for the dissolution of Lomita Pines, and for the appointment of a receiver to take possession of the assets of Lomita Pines. Trial was commenced on August 10, 1967; and the following day petitioner and the Ratcliffes' counsel entered into an oral stipulation, recited in open court, for judgment against petitioner for $40,000 and a court order awarding the Ratcliffes a quitclaim deed to lot 1 of the Lomita parcel. Judgment was entered January 2, 1968, consistent with the parties' stipulation.

At the time Mr. Ratcliffe complained to the State Bar, he enclosed a copy of a written stipulation signed by petitioner about the time of the civil action. In that stipulation, petitioner admitted fraudulent acts committed by him toward the Ratcliffes with regard to their interest in the Lomita parcel. Thus, the stipulation provides, in part: "The reconveyance of the $40,000 Deed of Trust in favor of Ratcliffe was obtained by [petitioner] from the Ratcliffes *with the understanding and representation by [petitioner] that it was for the purpose of obtaining First Trust Deed Loans and that the $40,000.00 Deed of Trust would be restored as a Second Deed of Trust after the obtaining of the First Deed of Trust Loan; that at the time thereof [petitioner] did not intend to carry this out nor was it done at all* in that the Second Trust Deed of the Ratcliffes' was never placed on the property again *and instead, [petitioner], without disclosing same to Ratcliffes borrowed funds and placed Second Deeds of Trust on the real property of the above action as security to third persons without disclosing same to the Ratcliffes.*" (Italics added.)

Other provisions of the written stipulation show that it was not to be used in the Ratcliffes' civil fraud action, as petitioner did not want judg-

---

cient funds. The disciplinary board found, however, that petitioner's statement was false, in that the civil action had not even been filed against him until some time after his check to the tax collector had been returned for insufficient funds, and, further, that there was no substantial amount of Lomita Pines funds on deposit in the account on which the check was drawn at the time it was issued.

ment against him entered on the basis of fraud. At the same time, the stipulation expressly permitted the Ratcliffes to use it to establish petitioner's fraud "if for any reason it should be deemed advisable," specifically in the event petitioner sought to discharge the Ratcliffes' judgment in bankruptcy.

Following the April 1968 complaint by the Ratcliffes to the State Bar, a local administrative committee conducted a preliminary investigation. On May 17, 1971, two years after the local administrative committee made its order, a notice to show cause was issued to commence the present proceeding.

The Ratcliffes' testimony at the committee hearings has been partially summarized above. In addition, Mr. Ratcliffe testified that it had been his understanding that if the Lomita Pines venture "went sour," he would be reimbursed for the $40,000 value of his Lomita parcel. He also testified that he had no legal representation in the preparation of the Lomita Pines agreement with petitioner and had believed that since petitioner and Schultz were both attorneys, "it should be safe."

Petitioner testified that under his agreement with the Ratcliffes, they were to end up with a "clear house and half the profits," but that from the very beginning Lomita Pines had been "in the red." He said that in 1964 he was having serious financial difficulties and borrowed about $285,000 from banks, business friends, and relatives to "save" both the Lomita Pines project and a separate apartment project (Sakura Gardens), which he was constructing in Torrance. He said that more than $30,000 of his own money went into Lomita Pines over and above the encumbrances he placed on the Lomita parcel and that he spent $6.500 (apparently included within the $30,000) to add a room to the Ratcliffes' home and to do other work necessary because of an error in the rough grade pads.

Petitioner admitted that one of the second deeds of trust he placed on the Lomita parcel was to secure a loan to himself personally. Although he testified that he could not recall what use was made of $18,000 in loans represented by three of the second trust deeds, he admitted that it was "possible" that he had used the proceeds for the Sakura Gardens project. He ultimately stated that although he had intended to establish a special bank account for Lomita Pines, as required by the partnership agreement, he never established such an account; that all the money obtained by placing the second deeds of trust on the Lomita parcel went into a "Lewis Construction" bank account; and that he has been unable to ascertain where the funds were disbursed.

Petitioner further testified that he maintained books and records with respect to Lomita Pines, but that he last saw them in 1967 or 1968 in the garage of his home and had no idea where they were at the time of the trial committee hearings. According to petitioner, he made a reasonably diligent effort in 1968 to reconstruct the accounts of Lomita Pines. At the State Bar hearings, however, he produced no records of the partnership's dealings with the Ratcliffes.

Contrary to the Ratcliffes' testimony, petitioner testified that there was never an understanding that they were to receive a new second deed of trust after the reconveyance by them and the recordation of the trust deeds given to secure the construction loans. In seeking to explain the inconsistency between the terms of the limited partnership agreement (specifying that the Ratcliffes were to receive a deed of trust subordinated only to the construction loans) and his understanding of his duties to the Ratcliffes, he claimed that in March 1963, at the time the Ratcliffes made the reconveyance, the partnership agreement was orally modified to provide that the Ratcliffes would not be in a subordinated position.

With respect to the written stipulation, in which petitioner admitted fraudulent acts in his dealings with the Ratcliffes, petitioner contended that the language of the stipulation was "manufactured" in order to allow the Ratcliffes a ground to raise in the event petitioner filed a petition in bankruptcy. He admitted, however, that the existence of some of the second deeds of trust he or Lomita Pines issued to third persons was not disclosed to the Ratcliffes, that as to others of the second deeds of trust he did not recall whether their existence was disclosed to the Ratcliffes, and that a new second deed of trust in favor of the Ratcliffes was not placed on the Lomita parcel.

■ Petitioner has the burden in this proceeding to show that the findings of the disciplinary board are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Eschwig* v. *State Bar,* 1 Cal.3d 8, 15 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662].) Petitioner, however, has not sustained this burden.

■ The testimony given by the Ratcliffes was convincing and showed petitioner's practice of deceit upon them; and it was consistent in all material respects with the documentary evidence, including petitioner's own admissions of fraudulent conduct in the written stipulation. On the other hand, petitioner's efforts to rebut the charges against him rested entirely upon his own testimony, which was repeatedly vague and inconsistent with the documentary evidence. Significantly, both the disciplinary board and the local administrative committee disbelieved petitioner; and since the

latter saw and heard petitioner and the witnesses against him, this court will give great weight to its findings. (*Ridley* v. *State Bar*, 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105].)

Petitioner's practice of fraud and deceit on the Ratcliffes involved moral turpitude and was reprehensible whether or not they were clients of his and whether or not any harm was done to them. (See *Scofield* v. *State Bar*, 62 Cal.2d 624, 628 [43 Cal.Rptr. 825, 401 P.2d 217]; *McKinney* v. *State Bar*, 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425].)

Petitioner's concealment from the Ratcliffes of his borrowings from other persons, which borrowings he secured by deeds of trust on the Lomita parcel, was no less serious than his affirmative deceptive statements to obtain the Ratcliffes' reconveyance. (See *Grove* v. *State Bar*, 63 Cal.2d 312, 315 [46 Cal.Rptr. 513, 405 P.2d 553].)

As hereinabove pointed out, petitioner, as general partner of Lomita Pines, assumed specific fiduciary duties toward the Ratcliffes, and the Ratcliffes put their trust in him, presuming that because he was an attorney he was properly fulfilling the fiduciary duties he had assumed and would protect their interests in Lomita Pines. Although petitioner was not acting as the Ratcliffes' attorney, he is, having accepted responsibilities of a fiduciary nature, held to the same high standards. (*Simmons* v. *State Bar*, 70 Cal.2d 361, 365 [4] [74 Cal.Rptr. 915, 450 P.2d 291].) ■ As said in *Clark* v. *State Bar*, 39 Cal.2d 161, 166 [246 P.2d 1]: "When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."

■ Petitioner's professed inability to locate the books and records of Lomita Pines for these proceedings is highly suspicious. ■ As said in *Clark* v. *State Bar, supra*, 39 Cal.2d 161, 174: " 'The purpose of keeping proper books of account, vouchers, receipts, and checks is to be prepared to make proof of the honesty and fair dealing of attorneys when their actions are called into question, whether in litigation with their clients or in disciplinary proceedings *and it is a part of their duty which accompanies the relation of attorney and client. The failure to keep proper books . . . is in itself a suspicious circumstance.*' " (Italics added.)

■ Petitioner contends that the present proceeding was instituted after an unreasonable lapse of time, as a result of which he has been denied due process of law. This contention, however, is without merit. To begin with, this proceeding is not a criminal proceeding and the procedures governing criminal proceedings are inapplicable, the purpose of the pro-

ceeding being, rather, to inquire into petitioner's fitness to practice law. (*Bernstein* v. *State Bar,* 6 Cal.3d 909, 916 (2) [101 Cal.Rptr. 369, 495 P.2d 1289]; *Eschwig* v. *State Bar, supra,* 1 Cal.3d 8, 18 (11).)

In addition, although it is clear that there was a delay in the proceeding far in excess of the time prescribed by rule 21(a) of the Rules of Procedure of the State Bar ([Deering's Cal. Codes, Rules Ann., Rules of Proc. of the State Bar, p. 371]; West's Bus. & Prof. Code foll. § 6087), compliance with that rule is not jurisdictional. Thus, rule 20(a) specifically provides: "The purpose of rule 21(a) and rule 34 is to expedite processing of complaints, the conduct of preliminary investigations and formal disciplinary proceedings, so that such matters shall be disposed of at the earliest practicable time.

"Failure to act within the time or times specified in rules 21(a) and 34 shall not bar consideration of an action on a complaint nor any proceedings, formal or informal, as in these rules provided." (See *Mrakich* v. *State Bar,* 8 Cal.3d 896, 906 [106 Cal.Rptr. 497, 506 P.2d 633]; *Reznik* v. *State Bar,* 1 Cal.3d 198, 204-205 (7) [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R.3d 161]; *Arden* v. *State Bar,* 52 Cal.2d 310, 316 [3] [341 P.2d 6].)

Under the circumstances, in the absence of a showing by petitioner of prejudice by reason of the delay, the fact that a longer period of time expired than is prescribed by rule 21(a) does not entitle petitioner to a dismissal of the proceeding.

Petitioner claims to have been prejudiced, but his claims of prejudice have been general in nature; and he has identified no witnesses he could have called or documents he could have produced if the hearings had been held earlier. He raised his claims before the trial committee at the commencement of the first trial committee hearing on September 23, 1971. The committee rejected his claims, on the ground, among others, that there was no showing of prejudice; but it afforded him an opportunity to renew his claims at a later time. Petitioner did so after the matter had been submitted, but he merely repeated his general claims of prejudice, taking the position that "prejudice must be presumed" from the length of the proceeding. In response, the trial committee granted him additional time in which to submit affidavits to establish the factual basis for his claims of prejudice. Petitioner, however, failed to submit any such documents, and the committee found that he had not been prejudiced by the length of the proceeding.

Thereafter, petitioner was advised that the matter would be reviewed by the disciplinary board; and he was informed that he could file an application to present additional evidence or for a hearing de novo, but

he did neither. Instead, on June 7, 1972, he filed a conditional acceptance of the trial committee's report, in which he conditionally waived the right to further review. The trial committee's recommendation was that petitioner be suspended from practice for six months and that such suspension be stayed on condition that he be placed on probation for a period of one year and that he be publicly reproved. The disciplinary board rejected petitioner's conditional acceptance, as it had the right to do, and ordered that the matter proceed in regular course for review by the board. Petitioner was then advised that he could still file a statement in support or opposition to the committee's findings or an application to present additional evidence or be given a hearing de novo, but he did neither.

From the circumstances in which petitioner advanced his general claims of prejudice and from the evidence against him herein, it is clear that he has failed to demonstrate prejudice to himself by the passage of time and that he cannot do so.

█ Petitioner contends that the record of his prior discipline should not have been considered by the disciplinary board in recommending the degree of discipline to be imposed by the court in the present proceeding. His argument is, in effect, that since the misconduct leading to the prior record of discipline occurred later than the facts giving rise to the present proceeding, it would be inappropriate for the discipline imposed in the prior proceeding to be taken into consideration. There is no merit to this contention, however. Whenever discipline is imposed, consideration is properly given to the presence or absence of a prior disciplinary record. (*Eschwig* v. *State Bar, supra,* 1 Cal.3d 8, 18; *Marsh* v. *State Bar,* 2 Cal.2d 75, 79-80 [39 P.2d 403].) Had the full facts of petitioner's earlier misconduct in the present matter been before the disciplinary board and the court in 1967, much more severe discipline would have been warranted at that time. █ In any event, regardless of petitioner's prior record, his fraud, deceit, and breach of fiduciary duties in the present matter justify the discipline recommended by the disciplinary board. (Cf. *Glickman* v. *State Bar,* 9 Cal.3d 179 [107 Cal.Rptr. 65, 507 P.2d 953].)

It is ordered that petitioner be suspended from the practice of law for a period of one year. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San

Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied August 8, 1973.