[L.A. No. 30328. In Bank. Feb. 14, 1975.]

CONRAD C. CALDWELL, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Rabern B. Prante for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California (Disciplinary Board) that petitioner be suspended from the practice of law for two years, the first year being actual suspension and the second year probation.

Petitioner was admitted to practice in California in 1938. He has no prior record of discipline.

In the mid-1950s petitioner befriended Mr. and Mrs. Philip R. Tarr, and began doing various legal work for them. Mr. Tarr had a history of mental illness and had been committed intermittently to mental institutions, as petitioner was aware. The bulk of the Tarrs' assets was an inheritance held in trust for them in an eastern bank (the Mellon Trust), drawing interest at a modest rate. Petitioner, in addition to being a lawyer, held a real estate broker's license and had been engaged in the brokerage of trust deeds. In 1957 he advised the Tarrs to liquidate the Mellon Trust and invest locally in second trust deeds, telling them that by so doing they could earn 10 percent or more on their money.

Accordingly, between April 1958 and May 1962, by a series of partial revocations of the Mellon Trust, the Tarrs turned over to petitioner a total of $102,387.96. They furnished petitioner with a power of attorney, and entrusted him with the money for the sole purpose of investing in second trust deeds on their behalf. It is undisputed that petitioner did not reduce the agreement to writing, and failed to fully advise the Tarrs of their rights and obligations under the trust.

Beginning in July 1958 petitioner deposited the funds of the Tarrs in a trust account in a local bank. During the ensuing five years petitioner used that account to buy some 20 trust deeds on the Tarrs' behalf. After the first few transactions, however, petitioner did not inform the Tarrs of any such purchase, but simply acted on his own initiative without either prior or subsequent notice to his clients. Moreover, petitioner continued to use his power of attorney in such transactions even though he knew that Mr. Tarr had been recommitted to a state mental hospital. (Cf. *Sullivan v. Dunne* (1926) 198 Cal. 183, 192 [244 P. 343].)

Petitioner operated through at least two real estate brokerage firms incorporated by him and in which he held a beneficial interest, the Kensington Mortgage Company doing business as the San Diego

National Mortgage Company, and the Tarr Investment Company.[1] For present purposes we need not attempt to sort out the complex relationships between petitioner and these entities; it is enough to note that whenever petitioner purchased a second trust deed for the Tarrs' account one of these companies acted as broker and charged the seller a 10 percent commission for its services. Petitioner claimed at the hearings that he did not benefit personally from such commissions, and there is no evidence he did so directly. But he also testified that one-half of the profits of the companies went into an office account which paid petitioner's overhead expenses, his secretary's salary, and his rent.[2] In addition, petitioner's wife acted as escrow agent and collected an escrow fee of $25 or $35 for each transaction. Petitioner did not inform the Tarrs of either of the latter indirect benefits he received from investing their trust funds. At the hearings petitioner conceded there was "technically" a conflict of interest in this manner of discharging his duties as trustee.

Petitioner put the Tarrs' funds to three other uses which were the subject of disciplinary inquiry and findings. First, on at least six occasions he made what were in effect short-term loans to individuals in urgent need of cash by the device of purchasing their second trust deeds with Tarr funds and holding them until a buyer could be found.[3] From each such transaction petitioner's mortgage companies received a commission and his wife received an escrow fee. For this use of their money the Tarrs were supposed to receive a "funding fee" of 1 percent a month or a minimum of $50; in almost every instance brought out in the testimony, however, petitioner conceded that fee had been "overlooked." None of these "funding operations" was authorized by the Tarrs, who remained wholly ignorant they were taking place.

[1]Despite the name, Mr. and Mrs. Tarr had no interest in the Tarr Investment Company—indeed, they did not even learn of its existence until they had terminated their fiduciary relationship with petitioner. Petitioner testified he simply picked the name "out of the air."

In addition to the two mortgage companies, petitioner also operated occasionally through a collection agency, the Sterling Adjustment Service, of which he was likewise part owner.

[2]More precisely, petitioner shared office space with the mortgage companies and was not charged rent.

[3]Petitioner called these "funding operations," and described their mechanics as follows: "Occasionally someone would come in with a deed of trust that they wanted to sell, and they were in a hurry, they needed money immediately, and instead of waiting for Roy Snyder [petitioner's business associate] to go out and find a purchaser for it they would what we call 'warehouse the trust deed.'

"I would furnish the funds to warehouse the trust deed. The trust deed would be bought, an assignment would be made in blank and that would be turned over to me to hold until they found an investor that wanted that particular trust deed. Then the investor would buy it; the money would come back into the Tarrs' trust fund and I would

Secondly, petitioner made two unsecured loans of Tarr funds to personal friends, in each case without the authorization or knowledge of the Tarrs. He lent $4,500 to his associates Roy Snyder and Peggy Kelly, receiving neither a promissory note nor security. He made no demand for repayment during the period in which he administered the Tarr trust, and the loan remained unpaid at the time the trust terminated in March 1963. Petitioner also lent a total of $7,700 of Tarr funds, in three installments, to one Gerald Hol, a contractor who was a client of petitioner. Again petitioner received neither a promissory note nor, at that time, security. He made these loans despite his knowledge, as Hol's attorney, that Hol was unable to pay off a number of judgment creditors. Hol thereafter fled the jurisdiction and never repaid the loans. Petitioner admitted "I was negligent in lending him the money," and told the Tarrs he would make up the loss. With additional Tarr funds he had purchased second and third trust deeds on real property owned by Hol, in a belated effort to secure the original loan of $7,700. The second trust deed was in default at the time of purchase, and Hol never made any payments on the third. When Hol abandoned the property, petitioner made repairs with further Tarr funds and rented the house for income. In 1963 Mr. Tarr's son, on his father's behalf, foreclosed on the Hol property.

Thirdly, between 1958 and 1962 petitioner made six payments to himself out of the Tarr trust funds as fees for his legal services. The payments totaled $7,092.59, of which $382.62 was reimbursement of travel expenses on business of the Tarrs. It is not contended the amount of the fees was excessive.[4] But it is undisputed that (1) petitioner had no specific authorization from the Tarrs to pay himself fees out of the trust funds whenever he deemed he had earned them, and (2) petitioner never notified the Tarrs, either before or after doing so, of the amounts or times he thus paid himself. He claimed in his testimony that the "full details" of such payments were discussed at a meeting in his office in July 1961 between himself, Mrs. Tarr, and Philip G. Tarr, Mr. Tarr's son and conservator. The latter testified, however, that at that meeting he specifically asked petitioner how he was compensated and how much he

---

deliver the trust deed to them."

Asked how long he would hold such a deed, petitioner replied, "Normally, just a few days. Sometimes they held longer, but we tried to get rid of them as soon as possible."

[4]Petitioner testified he charged the Tarrs on an hourly basis; he could not recall the precise rate, but believed it was $25 an hour. He further testified he charged them for only a relatively small portion of the time he actually spent on their business, but could not establish the actual figure because most of his time records were destroyed in a fire in his garage where they had been stored.

had been paid; according to the witness, petitioner declined to answer other than by saying, " 'I am not complaining,' and he smiled."[5]

Finally, throughout his management of the trust petitioner failed to maintain adequate books, and hence was never able to render a full accounting to the Tarrs.[6] Essentially petitioner's only records of all the trust transactions were his checkbook stubs and cancelled checks, the escrow files, and certain small ledger cards. Time and again in his testimony he was unable to produce appropriate written records of the transactions he described, finally admitting that "I didn't keep too good books." Philip G. Tarr testified that at the July 1961 meeting he asked petitioner for an accounting but did not receive any, either then or later. In July 1964 the Tarrs filed their civil action against petitioner for an accounting and for damages for breach of fiduciary duties; in that proceeding petitioner was still unable to produce satisfactory records and make a full accounting, and the court so found.[7]

The local administrative committee made findings substantially in accord with the foregoing facts and concluded that petitioner had violated rules 4 and 9 of the Rules of Professional Conduct and thereby his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, 6103). The findings of the Disciplinary Board were essentially identical to those of the committee. Although petitioner does not expressly concede the issue of his culpability (compare *Toll* v. *State Bar* (1974) 12 Cal.3d 824, 826 [117 Cal.Rptr. 427, 528 P.2d 35]), his petition for review does not attack either the conclusions of the local administrative committee or the principal findings of misconduct by the Disciplinary

---

[5]As of the date of the meeting petitioner had paid himself all but $300 of the sum of almost $7,000 he drew from the trust as attorney's fees. In a subsequent civil action the court ordered petitioner to repay that entire sum to the Tarrs.

[6]Disciplinary Rule DR 9-102(B) of the American Bar Association Code of Professional Responsibility declares in relevant part that a lawyer shall "Promptly notify a client of the receipt of his funds, securities, or other properties," and "Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them." The same rule has recently been adopted by the State Bar. (Rule 8-101(B), Rules of Professional Conduct, eff. Jan. 1, 1975.) This duty is all the more pressing when, as here, the clients' funds are received and administered pursuant to an express trust.

[7]At the time of fixing the damages in the civil action the court complained, "It is impossible for this Court to take the material presented and by the process of adding and subtracting arrive at anything that would be reliable, and if I were to go through the accounting ten times in an attempt to do so I would come up with ten different conclusions in terms of the amount, and if I did it a hundred times I suspect it would be a hundred different conclusions in terms of the amount, because there was not an accounting in this case but rather I suppose one would characterize it as a conglomeration of confusion."

Board. He complains only of delays in the proceedings below, of certain alleged evidentiary errors, of the incompleteness or inaccuracy of a few of the findings of fact, and of the degree of discipline recommended.

In these proceedings, of course, petitioner has the burden of showing that the findings of the board are unsupported by substantial evidence. (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 444 [113 Cal.Rptr. 602, 521 P.2d 858], and cases cited.) ■ By failing to assume that burden petitioner may fairly be deemed to have conceded he is guilty of professional misconduct warranting discipline. Our review of the record leads us to the same conclusion. We therefore proceed to consider petitioner's specific contentions.

Petitioner asserts he was deprived of due process of law by the delay between the filing of the complaint against him in the State Bar proceedings (Nov. 26, 1963) and the ultimate issuance of the notice to show cause (Oct. 18, 1972). The first seven years of that delay, however, were occasioned by the disposition of the civil action filed against him by the Tarrs. At the preliminary investigation on January 23, 1964, the local committee suspended the proceedings against petitioner upon being advised such a lawsuit would be instituted. The suspension was authorized by rule 19.1(a) of the Rules of Procedure of the State Bar (West's, Bus. & Prof. Code, foll. § 6087 [Deering's, Cal. Codes, Rules, Pocket Supp. (1974) p. 214). (See also *Neblett* v. *State Bar* (1941) 17 Cal.2d 77 [109 P.2d 340].) The civil complaint of the Tarrs against petitioner was filed in superior court on July 10, 1964. The case was tried in February 1966, and on March 16, 1966, a stipulated judgment for the plaintiff was entered. Petitioner paid $2,500 on that judgment. On November 1, 1966, however, the Tarrs moved to set aside the judgment on the ground that petitioner had fraudulently concealed certain assets. The motion was granted and the case was retried in January and February 1969. On July 14, 1969, an increased judgment for the plaintiffs was rendered. The parties thereafter agreed to a compromise of this judgment upon payment by petitioner of an additional $12,500, and the compromise was approved by the court on January 21, 1971.

The State Bar proceedings promptly resumed. A further preliminary investigation was held on February 24, 1971, resulting in the drafting of a notice to show cause. A tentative hearing date of May 27, 1971, was agreed upon. That date was cancelled, however, when study of the civil file disclosed the complexity of the case. Before a new hearing date could be set, the matter was temporarily placed in abeyance by reason of a reorganization of State Bar disciplinary procedures and staffing.

Proceedings were thereafter resumed, and the first notice to show cause was superseded by a new notice issued on October 18, 1972. Eight hearings were held between February and July 1973, and the local administrative committee issued its findings and conclusions on August 6, 1973.

■ In the circumstances most of the delay of which petitioner complains was either justified by the pendency of the civil action or caused by petitioner's own conduct. Moreover, it is settled that any unreasonable delay which may have occurred is neither a denial of due process of law (*Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 713-714 [108 Cal.Rptr. 821, 511 P.2d 1173]) nor a jurisdictional defect (*id.,* at p. 714). "[M]ere lapse of time is no defense unless *specific* prejudice is shown." (Italics in original.) (*Yokozeki* v. *State Bar* (1974) *supra,* 11 Cal.3d 436, 449; accord, *Taylor* v. *State Bar* (1974) 11 Cal.3d 424, 434 [113 Cal.Rptr. 478, 521 P.2d 470], and cases cited.)

Petitioner fails to show specific prejudice within the meaning of the foregoing rule. He asserts only that "The passage of time dulls the memory. Witnesses were either unavailable or unable to recollect. . . ." These "witnesses," however, are not further identified.[8] Such vague generalizations are manifestly insufficient to discharge his burden. (*Lewis* v. *State Bar* (1973) *supra,* 9 Cal.3d 704, 714.) In addition, we note that throughout the delay complained of no formal charges were pending against petitioner and he was able to continue his practice of the law.[9]

■ Petitioner next challenges the admission into evidence of certain portions of the record of the civil action filed by the Tarrs. He points first to the pleadings, findings of fact and conclusions of law, and judgment in that action, and argues they are inadmissible because of a difference in burden of proof: in the civil action the burden was assertedly on petitioner, as the fiduciary, to show good faith and account for the trust funds, while in the disciplinary proceedings the burden was on the State Bar to prove petitioner was guilty of the charged misconduct. The

___

[8] In a declaration filed in support of his motion to-dismiss before the local administrative committee petitioner sought to premise prejudice on the death of his wife, who had acted as escrow agent in his dealings with the Tarr trust. The event is irrelevant, however, as it took place in July 1964, only a few months after the first preliminary investigation by the State Bar.

[9] Petitioner also contends he was 51 years of age in 1963 when these proceedings were initiated, that he is now 63, and that at this age he is handicapped in undertaking any new enterprises in lieu of practicing law. He thus argues the delay is indeed prejudicial. While we do not approve of any dilatoriness by the State Bar (see fn. 11, *post*), we point out petitioner had as a compensating factor the benefit of those 12 uninterrupted years of law practice.

distinction is primarily procedural, however, and does not detract from the essential identity of the factual issues in both proceedings. Because of that identity, "we can take judicial notice of matters in a civil action which arise out of a course of conduct underlying the charges against an attorney in disbarment proceedings." (*Yokozeki* v. *State Bar* (1974) *supra*, 11 Cal.3d 436, 444, and cases cited.) The documents in question were properly admitted.

■■ Also admissible were petitioner's depositions in the civil action and the transcript of the testimony there given. The former were not in fact received as exhibits but were merely marked for identification; limited portions were read into the record, but subject to petitioner's objections to specific questions and answers. The civil trial transcript, of course, is expressly made admissible by statute, "without proof of the nonavailability of the witness" (Bus. & Prof. Code, § 6049.2). Petitioner's objection that it was "incomplete" because unaccompanied by the trial exhibits is frivolous; his counsel was in possession of all the defense exhibits and could have obtained the plaintiffs' exhibits upon request, but failed to introduce either at the hearings. In any event, from our own review of the case we observe that the civil trial transcript can be meaningfully read without the necessity of referring to the exhibits.

■ Petitioner's limited criticism of the findings of fact of the Disciplinary Board is likewise without merit. He contends that several of the findings are "incomplete" because they omit additional facts which he believes should have been included. It would unduly lengthen this opinion to discuss each such charge separately; we have examined the findings in question, and conclude that the omitted facts are either irrelevant or immaterial to the precise issues before the board.[10] Petitioner also contends that other findings are unsupported by the evidence; again we have examined the record, and are of the view that the challenged findings are either correct or, if not, err in respects which are unrelated to the issues and hence cannot be deemed prejudicial.

■ Finally, petitioner urges two grounds for mitigation of the recommended discipline. The local administrative committee proposed

---

[10]For example, finding IX correctly recites that petitioner's unauthorized and unsecured loan of $4,500 of Tarr trust funds to Roy Snyder and Peg Kelly had not been repaid when the trust was terminated in March 1963, and finding XII states that in addition to the funds returned to the Tarrs at that time or previously paid out on their behalf, "the Tarrs retained their claim against Kelly and Snyder for $4,500.00." Petitioner complains that the findings do not go on to recite that the loan was eventually repaid by Kelly and Snyder. But that fact—if it be a fact—in no way exonerates petitioner from his fault in making the loan in the first instance.

suspension from practice for two years, with three months' actual suspension. The Disciplinary Board voted eleven to one to recommend suspension for two years, with one year's actual suspension; the twelfth member of the board dissented solely on the ground that such discipline would be insufficient. Our review of the record convinces us that petitioner has failed to sustain his burden of showing that the recommendation of the board is erroneous or unlawful. (*Yokozeki* v. *State Bar* (1974) *supra,* 11 Cal.3d 436, 450, and cases cited.)

First, petitioner reverts to the asserted delay in the proceedings below, and invokes those decisions in which we have given weight to such delay as a factor in mitigation. (*Arden* v. *State Bar* (1959) 52 Cal.2d 310, 321 [341 P.2d 6]; *Gray* v. *State Bar* (1936) 7 Cal.2d 177, 181 [59 P.2d 1033]; see also *Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 703 [108 Cal.Rptr. 806, 511 P.2d 1158]; *Toll* v. *State Bar* (1974) *supra,* 12 Cal.3d 824, 832.) But each case must be decided on its own particular facts. (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337].) Here, as noted above, the major portion of the delay was justified by the Tarrs' civil action against petitioner, an additional portion was the result of petitioner's own conduct in concealing assets and thus causing a retrial of that action, and petitioner has not shown any specific prejudice by reason of the remainder.[11]

Petitioner also emphasizes he was not enriched by his misconduct and neither were the Tarrs impoverished. He reasons that when all the figures are added up—i.e., the income and capital appreciation during the life of the trust, various sums paid out of the trust account at the Tarrs' request for their living expenses, medical costs, property taxes and repairs, and the value of the trust deeds and properties returned to them upon termination—the total benefits received by the Tarrs exceed the amounts they entrusted to petitioner. But "his misconduct is not excused in any way merely because the client ultimately suffered no loss. . . ." (*Bradpiece* v. *State Bar* (1974) *supra,* 10 Cal.3d 742, 748.) ■ The effect of petitioner's conduct on the Tarrs' eventual financial position was litigated in the civil action brought by the latter; the purpose of the present proceeding, by contrast, is "to inquire into the fitness of the

---

[11]This does not mean, of course, that we condone any unnecessary or unreasonable delay in State Bar proceedings. The State Bar would do well, as urged in its own rules, "to expedite processing of complaints, the conduct of preliminary investigations and formal disciplinary proceedings, so that such matters shall be disposed of at the earliest practicable time." (Rules of Procedure, rule 20(a); West's, Bus. & Prof. Code, foll. § 6087 [Deerings, Cal. Codes, Rules, p. 369].) The number of cases in which undue delay has been charged as a ground for dismissal or mitigation demonstrates that this goal, regrettably, is not often attained in practice.

attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." *(Ibid.)* Gross mismanagement of clients' trust funds, such as here shown by the record, seriously undermines the public's confidence in the bar. In the circumstances the purpose of these proceedings will best be served by imposing the discipline recommended by the board.

It is ordered that petitioner be suspended from the practice of law for two years but that execution of the order be stayed and that he be placed on probation for said period upon the conditions prescribed by the Disciplinary Board, including actual suspension for one year. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955, subdivision (a), of the California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.