[L.A. No. 30391. In Bank. May 28, 1975.]

GARY J. SODIKOFF, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Aitken, Bradshaw & Andres and Wylie A. Aitken for Petitioner.

Herbert M. Rosenthal, Garrett H. Elmore and Arthur L. Margolis for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended for one month. Petitioner was admitted to practice in California in 1964. He has no prior record of discipline.

James McCawley, a resident of Orange County, died in November 1969. At the time of his death he owned two parcels of real property in the City of San Clemente. One parcel was a single lot on Avenida Palizada, and the other comprised two adjoining lots on West Marquita Street. Mr. McCawley held title to this property in joint tenancy with one of his nephews, Anthony J. Wehrley, who was a residuary beneficiary of his will. Mr. Wehrley was an elderly man, and lived in England.

Petitioner was counsel of record for the administrator with the will annexed of Mr. McCawley's estate. A question arose as to the ownership of the two parcels, and on December 8, 1970, the court quieted title in Mr. Wehrley. On December 24, 1970, petitioner wrote to Mr. Wehrley on his firm's stationery, advising him of the judgment in his favor. Petitioner further explained that his office had thus far been managing the property, but suggested that it be sold and asked if Mr. Wehrley "would like us to obtain offers from some of our clients. . . ."[1]

---

[1]The relevant portions of the letter read:

"Up to now, our office has been gratuitously managing the property on your behalf and we have collected rents and disbursed same to make the utility payments and annual tax obligations. We have, however, disbursed no funds to pay the assessment bond which, to date, is in excess of $900.00.

"The property at present time is not in a marketable condition for the reason that there are inheritance and estate tax liens against it. When such taxes have been computed and apportioned between the heirs and paid, the property may be released and made marketable.

"We would appreciate your informing us if you would like us to obtain offers from some of our clients who deal in real estate in the San Clemente area. In any event, I do not believe that you should retain ownership of the property for the reason that you do not live in California and cannot manage the real property, and probably do not want to

Mr. Wehrley replied by letter dated January 7, 1971, stating, "As you say—Seeing that I am living in England I would not be able to look after the property, also I do not want to be troubled with the tax payments and consequences. I am in complete agreement with what you suggest as regards disposal of [the] property, so please put the necessary machinery in motion for its disposal. Re management of [the] property, I would like you to continue on as you have done up to this."

Thereafter, but evidently before March 30, 1971, petitioner sent an undated letter to Mr. Wehrley, again on his firm's stationery, asserting that "One of our clients by the name of Acquistate, a California Corporation," had made an offer to buy the two parcels for a total of $20,000. In the letter petitioner recited that "I have explained to Acquistate" that Mr. Wehrley would not be responsible for the commission or certain closing costs, and added that the deeds could be prepared "in our office" and sent to England to be executed.[2] Mr. Wehrley accepted the offer by letter of March 30, 1971.

Petitioner failed to disclose to Mr. Wehrley, however, that "Acquistate" was in fact not a client of petitioner's law firm but an *alter ego* of petitioner individually. It was a closed corporation owned and controlled by petitioner; its incorporators were petitioner, his secretary, and his accountant. Indeed, Acquistate was not actually incorporated until April 7, 1971, i.e., *after* petitioner told Mr. Wehrley that "Acquistate, a California Corporation" had made the offer.

Petitioner further failed to disclose to Mr. Wehrley that on February 16, 1971, i.e., six weeks *before* Mr. Wehrley's acceptance of the offer to

---

be bothered with the tax consequences that will result from your continuing to own the real property.

"We would appreciate your response to this letter at your earliest convenience and particularly your informing us what you would like us to do with respect to the management and upkeep of the real property."

[2]The relevant portions of the letter read:

"Pursuant to your request, we have 'set the necessary machinery in motion' to attempt to find buyers for the two parcels of real property located in San Clemente.

"One of our clients by the name of Acquistate, a California Corporation, has made an offer, as follows:

"(a)For 202 Palizada, San Clemente, the sum of $8,000.00 cash

"(b)For 248 and 248-1/2 Marquita, the sum of $12,000.00 cash

"I have explained to Acquistate that you will in no way assume responsibility for (1) termite work (2) title insurance (3) escrow fees, or (4) any commission of any kind. . . .

"If you want to proceed with the sale as proposed, it will be necessary for you to execute real property deeds and have them notarized in England. The deeds themselves can be prepared in our office, and mailed to you for execution and return."

buy the property for $20,000, petitioner wrote a letter to the inheritance tax appraiser handling the McCawley estate, acknowledging that the property in question had been valued at a total of $46,500 and doubting there had been any recent change in that value.[3]

In mid-April 1971 petitioner's law associate and his former law partner learned of the matter and advised Mr. Wehrley not to proceed with the transaction. The sale of the property was never consummated.

Petitioner declined to testify in his own behalf in the proceedings below. The disciplinary board made findings essentially in accord with the foregoing facts, and in particular found that at all relevant times a fiduciary relationship existed between petitioner and Mr. Wehrley; that petitioner knowingly made false statements to Mr. Wehrley when he advised him that Acquistate was a client of petitioner's firm which had entered a bid to buy the property for $20,000; and that petitioner knew the value of the property in question was substantially in excess of the amount offered. The board concluded that petitioner was guilty of professional misconduct warranting suspension from practice for a period of one month.

Petitioner first complains that various items of documentary evidence were admitted without proper foundation. We find it unnecessary to rely on a number of the challenged items in our appraisal of the case. Of the remaining matters objected to, clearly the most important is petitioner's undated letter to Mr. Wehrley asserting that Acquistate was a client of his firm and had offered to buy the property for $20,000. (Fn. 2, *ante.*) ▮ Petitioner does not claim that he did not write that letter,[4] but contends only there was no testimony showing the letter was in fact received by Mr. Wehrley. The point is not well taken. Grant R. Bertelot,

[3]The relevant portions of the letter read:

"We are advised that your office is now handling the above-entitled estate, said matter having been transferred to you upon the retirement of Geo. Dean Field.

"On April 16, 1970, real property located at 248 Marquita, San Clemente, was valued at $22,500.00.

"On October 2, 1970, real property located at 202 Palizada, San Clemente, was appraised (land and improvements) at $24,000.00.

"Presently, we are deciding whether to elect date of death or one year from date of death as the valuation date for purposes of figuring Federal Estate Taxes. We would appreciate your determining if there has been any change in the value of the above-described real property.

"Since the improvements on the property are very old, we doubt that there has been any fluctuation."

[4]Petitioner's former associate identified the letterhead as that of the firm and the signature as that of petitioner. (See Evid. Code, § 1416.)

an investigator for the Orange County District Attorney's office, testified that on May 4, 1971, pursuant to an inquiry he was conducting into the case, he wrote to Mr. Wehrley in England asking him to forward all "documentation you have in this matter," including all correspondence received from petitioner. The witness further testified that approximately two weeks later he received a reply from Mr. Wehrley dated May 12, 1971, enclosing a number of documents which included the undated letter from petitioner here in question. Petitioner stipulated to the subsequent chain of custody of the letter.

Petitioner does not dispute the genuineness of Mr. Wehrley's reply of May 12, 1971, to Mr. Bertelot (cf. Evid. Code, § 1420), but argues that the language of the cover note—"Enclosed please find all the correspondence asked for"—is hearsay. The argument misses the mark. The fact that Mr. Wehrley actually received the undated letter of offer from petitioner is not shown by any explanation in the cover note but simply by the circumstance that petitioner's letter was physically enclosed in the reply of Mr. Wehrley to Mr. Bertelot's request for all correspondence received from petitioner. Manifestly Mr. Wehrley could not have enclosed that letter unless he had first received it, and it would therefore have been admissible even if there had been no cover note at all.

Petitioner next questions various findings of fact, and argues generally that the case of the State Bar is "speculative." In these proceedings, of course, petitioner has the burden of showing that the findings of the board are unsupported by substantial evidence. (*Caldwell* v. *State Bar* (1975) 13 Cal.3d 488, 495 [119 Cal.Rptr. 217, 531 P.2d 785].) He fails to meet that burden.

Petitioner contends there was no proof of a fiduciary relationship between himself and Mr. Wehrley at any time: although he was the attorney for the McCawley estate and Mr. Wehrley was a beneficiary of that estate, petitioner emphasizes (1) that the probate court authorized him to file the quiet title action *against* Mr. Wehrley and (2) that the property in question was held in joint tenancy and hence was not a probate asset. These are irrelevant distinctions. Mr. Wehrley was essentially a nominal defendant in the quiet title action; although he made no appearance therein, judgment was entered in his favor. Moreover, even though the property was a nonprobate asset, it was by reason of Mr. McCawley's death that sole ownership thereof devolved upon Mr. Wehrley.

In any event, the fiduciary relationship here arose largely after the termination of the quiet title suit and any potential conflict of interest ensuing therefrom. Its origin was primarily petitioner's letter of December 24, 1970, to Mr. Wehrley, in which he advised the latter that he was "managing the property on your behalf" and inquired "if you would like us to obtain offers from some of our clients" for the purchase of the property. (Fn. 1, *ante.*) The tone of the letter, taken as a whole, clearly implied that the petitioner or his law firm would, as Mr. Wehrley desired, either continue to manage the property for his account or act as his agent in finding a purchaser. Each is a service often rendered by an attorney for his client. We also take into consideration the fact that Mr. Wehrley knew petitioner was an attorney, and conversely, that petitioner knew Mr. Wehrley was an elderly man living thousands of miles away. Petitioner must therefore have known that Mr. Wehrley would be likely to rely on him, as the attorney for his benefactor's estate, for guidance and assistance in dealing with property that he could not personally dispose of or manage. Thus even if no formal attorney-client relationship existed, petitioner voluntarily assumed a position of trust and confidence vis-à-vis Mr. Wehrley with respect to the property in issue. (Cf. Civ. Code, § 2219.) ■ In such circumstances petitioner should be held to similar high standards of conduct: "When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct." (*Clark* v. *State Bar* (1952) 39 Cal.2d 161, 166 [246 P.2d 1], and cases cited; accord, *Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 713 [108 Cal.Rptr. 821, 511 P.2d 1173].)

Petitioner next alleges a total lack of evidence to support the finding that the value of the property was substantially in excess of $20,000. He emphasizes that the only testimony given on the issue was that of his own witness Bruce Swartout, who opined the property was worth $18,000 to $20,000. But Mr. Swartout was not a totally disinterested witness. He was a local real estate broker and promoter, and had expressed a particular interest in developing the very property in question by means of a joint venture with petitioner after Acquistate had purchased it and obtained a zoning variance. In addition, for more than five years he had known petitioner "intimately," and for a similar period the latter had been retained as counsel for Mr. Swartout's various corporations, spending as much as 50 percent of his time on their business.

■ By contrast, the record contains three items of documentary evidence which are not subject to similar possibilities of personal bias

and which fully support the challenged finding. We have already adverted to petitioner's letter of February 16, 1971, to the inheritance tax appraiser, acknowledging that the property had been valued for inheritance tax purposes at a total of $46,500. (Fn. 3, *ante.*) Secondly, in the above-mentioned letter of May 4, 1971, from Grant Bertelot, the investigator for the Orange County District Attorney's office, to Mr. Wehrley, Mr. Bertelot reported that for property tax purposes the Orange County Tax Assessor had determined the fair market value of both parcels to be $42,120. And in a letter dated April 5, 1972, Mr. Wehrley advised the Orange County District Attorney's office, through his solicitors, that he had recently contracted to sell the Marquita parcel alone for a total $27,500.

We need not explore petitioner's elaborate objections to the technical admissibility of these letters.[5] This is not an eminent domain action, in which the precise value of certain real property at a specific moment must be carefully proved. The disciplinary board could consider the foregoing documentary evidence for the limited purpose of determining whether petitioner, in violation of his fiduciary duty to Mr. Wehrley, intended and attempted a secret purchase of the property for his own account at a price which he knew or should have suspected was substantially below its fair market value. Petitioner himself concedes that his letter of February 16, 1971, "would perhaps be admissible to show [his] state of mind. . . ." It would, and in this disciplinary proceeding the issue of petitioner's state of mind was crucial.

Petitioner also contends that even if his statements to Mr. Wehrley concerning the alleged offer by Acquistate were false representations, it was not shown that they "materially induced" Mr. Wehrley to agree to the sale. Again petitioner misconceives the thrust of these proceedings. This is not a prosecution for the crime of obtaining property by false pretenses, or even a civil action for fraud. ■ It is an inquiry into whether petitioner has lived up to the high ethical standards of his profession. (See *Marlowe* v. *State Bar* (1965) 63 Cal.2d 304, 308 [46 Cal.Rptr. 326, 405 P.2d 150].) ■ The record shows that he fell far short of those ideals when he knowingly tried to take advantage of a relationship of personal trust and confidence by falsely representing that his corporate *alter ego* was a client of his law firm and by attempting to buy through that device the property of Mr. Wehrley for substantially

---

[5] We note, however, that the first was written by petitioner himself, the second was verified by its author on the witness stand, and the third was introduced into evidence by petitioner.

less than its true value. In such circumstances "it is immaterial whether any harm was done, since a member of the State Bar should not under any circumstances attempt to deceive another person." (*McKinney* v. *State Bar* (1964) 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425], and cases cited.)

Petitioner questions the motives of the complainants, his former associate and his former law partner. ■ Although we scrutinize with care any evidence bearing "the earmarks of private spite" (*Peck* v. *State Bar* (1932) 217 Cal. 47, 51 [17 P.2d 112]), it is nevertheless settled that "Whatever may have been the instigating factor, or whatever may have been the personal motive, in the initiation of the State Bar proceeding, are not matters of controlling concern in a case where the facts disclosed independently lead to the conclusion that the attorney is subject to some disciplinary action." (*Rohe* v. *State Bar* (1941) 17 Cal.2d 445, 450 [110 P.2d 389]; accord, *Pickering* v. *State Bar* (1944) 24 Cal.2d 141, 145 [148 P.2d 1].) Here we have not found it necessary to rely on the allegedly tainted testimony, and the remainder of the record amply supports the recommended discipline.

In the above-mentioned letter of April 5, 1972, to Mr. Bertelot, Mr. Wehrley's solicitors reported that the latter had "accepted" petitioner's explanation of his conduct, and that had he been able to travel to California his testimony would "favour" petitioner. Petitioner makes much of these assertions, but for the purposes of the proceeding before us they do not absolve him of his misdeed. ■ An act of violating professional standards of behavior is not excused merely because the client or a third person suffers no loss: "[i]t is not necessary that actual harm result to merit disciplinary action where actual deception is intended and shown." (*Reznik* v. *State Bar* (1969) 1 Cal.3d 198, 204 [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R.3d 161].) This is so, of course, because the very reason for the proceeding is "to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." (*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) That fitness is called into question when, as here, the record shows a knowing attempt by the attorney to gain a personal advantage by means of deceit.

■ Lastly, petitioner complains of certain delays in the proceedings below and invokes those decisions which have given weight to such delay as a factor in mitigation. (See, e.g., *Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 703 [108 Cal.Rptr. 806, 511 P.2d 1158].) But on this question "each

case must be decided on its own particular facts." (*Caldwell* v. *State Bar* (1975) *supra,* 13 Cal.3d 488, 498.) Here the delays were not of substantial proportions; petitioner was able to continue his practice of law during the period involved, and he fails to show specific prejudice from the mere lapse of time. (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 439 [113 Cal.Rptr. 602, 521 P.2d 858]; *Taylor* v. *State Bar* (1974) 11 Cal.3d 424, 434 [113 Cal.Rptr. 478, 521 P.2d 470].)

The question of the proper discipline remains. The local administrative committee and the disciplinary board recommended suspension from the practice of law for one month. ■ Although their recommendation is entitled to great weight, it is not binding on us. This court has "the power to weigh and pass upon the sufficiency of the evidence, to determine if the recommended discipline is appropriate, and, if justified, to impose more severe discipline than recommended." (*Glickman* v. *State Bar* (1973) 9 Cal.3d 179, 184 [107 Cal.Rptr. 65, 507 P.2d 593]; accord, *Silver* v. *State Bar* (1974) 13 Cal.3d 134, 147 [117 Cal.Rptr. 821, 528 P.2d 1157], and cases cited.) In view of the gravity of the misconduct shown by this record and petitioner's apparent lack of insight into the wrongfulness of his actions (see *Noland* v. *State Bar* (1965) 63 Cal.2d 298, 303 [46 Cal.Rptr. 305, 405 P.2d 129]), we have concluded that the recommended discipline is inadequate and that petitioner should instead be suspended for a period of six months. In the circumstances petitioner should also comply with rule 955 of the California Rules of Court.

■ It is ordered that petitioner be suspended from the practice of law for a period of six months. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955 (a), of the California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.