**In re Application of Dan G. MAILATH for Admission by Examination to the Oklahoma Bar Association.**

**Dan G. MAILATH, Bar Applicant,**

v.

**STATE ex rel. The OKLAHOMA BOARD OF BAR EXAMINERS, Respondent.**

**SCBD No. 3421.**

Supreme Court of Oklahoma.

March 1, 1988.

Rehearing Denied March 29, 1988.

Dan G. Mailath, Bar Applicant, pro se.

Patrick H. Kernan, Tulsa, for respondent, Oklahoma Bd. of Bar Examiners.

OPALA, Justice.

Dan G. Mailath [bar applicant or Mailath] seeks admission by examination as a licensed lawyer. The Oklahoma Board of Bar Examiners [Board] rejected his application, because he failed to meet the requirements of Rule 1, § 1, Rules Governing Admission to the Practice of Law in the State of Oklahoma,[1] which provides: "To be admitted to the practice of law ... the applicant ... shall have good moral character, due respect for the law, and fitness to practice law." The bar applicant timely requested a Rule 11[2] hearing. Following a two-day inquiry the Board determined that Mailath failed to establish he was ethically fit to practice law. He now seeks relief from the Board's post-hearing rejection.

The issues presented are: 1) Was the Board's Rule 11 notice of the applicant's rejection defective for failure to include a reasoned explanation of the adverse action? and, if so, 2) Does the procedural error warrant corrective relief? and lastly 3) Is the applicant ethically qualified to seek bar admission by examination? To the first question we give an affirmative answer; to the second and third, a negative one.

I

## THE DUE PROCESS CLAIM

The Board's written notice of Mailath's rejection did not include any reasons for its decision. The Board is expressly relieved by Rule 11, § 1[3] of any duty to disclose specific facts. Mailath contends that the Board's notice was deficient in the due process sense. We agree.

■ State bar admission proceedings are governed by federal due process standards. In *Willner v. Committee on Character and Fitness*[4] the Court declared that a rejected bar applicant is entitled to disclosure of the reasons why he was found to lack the requisite ethical fitness.[5] This informational element must be included in the notice to accord an applicant meaningful post-rejection opportunity to prove he is qualified, if a hearing be timely requested. We now impose upon the Board the duty to provide *all* future applicants who are rejected for ethical unfitness with notice of the reasons why their quest for admission is refused. The Board need not list every item and source of information upon which it relies in rejecting an applicant. In order to satisfy due process requirements, the Board must *adequately* inform the applicant of the *nature* of the evidence against

1. 5 O.S.Supp.1986, Ch. 1, App. 5.

2. The terms of Rule 11, § 2, Rules Governing Admission to the Practice of Law in the State of Oklahoma, 5 O.S.Supp.1986, Ch. 1, App. 5, provide:
 "*In the event the applicant wishes to take issue with the Board's decision, applicant shall be entitled to a hearing before the Board* by delivering a written request for a hearing to the Board within twenty (20) days after the notice of refusal has been mailed to the applicant. The applicant shall have the right to be represented by counsel, and present evidence, at the time and place fixed by the Board for the hearing. In connection with the hearing, the Board shall have the power to take and hear testimony, administer oaths and affirmations, and, at the request of the applicant or the Board, the Clerk of the Supreme Court of Oklahoma shall issue subpoenas for witnesses and subpoena duces tecum." [Emphasis added.]

3. The terms of Rule 11, § 1, Rules Governing Admission to the Practice of Law in the State of

Oklahoma, 5 O.S.Supp.1986, Ch. 1, App. 5, provide:
 "Should the Board of Bar Examiners determine to refuse to grant approval to an applicant to take the Bar Examination, or to refuse to grant an applicant admission to practice without examination, or to refuse to recommend any applicant for admission to practice on any grounds except failure to pass the bar examination, then a written notice shall be mailed to such applicant stating the section (or sections) under Rule One upon which the refusal is based. *No specific facts need be set forth by the Board of Bar Examiners in its refusal notice to the applicant.* The refusal notice puts in issue all matters which may relate, directly or indirectly, to the applicant's eligibility to practice law in the State of Oklahoma." [Emphasis added.]

4. 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 [1963].

5. *Willner v. Committee on Character and Fitness, supra* note 4, 373 U.S. at 105, 83 S.Ct. at 1181.

him.[6]

Because the Board's notice was procedurally defective, the question we must now resolve is whether the applicant was so prejudiced by the lack of adequate prehearing notice as to merit corrective relief. Our examination of the record reveals Mailath not only had sufficient knowledge of the basis for his rejection, but also suffered no apparent detriment, directly or indirectly, from the Board's deficient rejection notice.

Once notified his application was rejected, Mailath not only demanded a hearing but also requested an early date. The Board provided him a list of 26 prospective witnesses and scheduled a hearing date at a time consistent with his request.[7] In turn, he submitted a list of 63 individuals who were to be called as witnesses on his behalf.

Mailath knew most, if not all, the Board's witnesses and why their testimony might be sought. These persons included former clients, ex-partners and lawyers who appeared in previous and pending lawsuits against him. He knew the allegations made against him in those cases. He must have known the essence of why he had been rejected, what to expect at the hearing and the burden he was to shoulder in an effort to show himself ethically qualified to practice law. He did not request— before the hearing began—that the Board provide him with the basis for its adverse decision. Nor does he cite in his brief to us any specific instance shown by the record of prejudice from the Board's deficient rejection notice.

We conclude and hold that Mailath is not entitled to corrective relief on his due process claim. He suffered no demonstrated detriment from the Board's deficient prehearing rejection notice.

## II

### THE BAR APPLICANT'S CLAIM TO ADMISSION BY EXAMINATION

[4] In a proceeding to review the Board's decision finding an applicant to lack ethical fitness to practice law, this court will examine the entire record tendered for relief and consider the applicant's quest for admission *de novo*. [8]

Mailath contends the Board erroneously evaluated the adverse evidence as well as ignored his status as a certified public accountant [CPA] and the testimony on his *present* moral character. We disagree and hold on the record before us that the bar applicant failed to meet his burden of proving his ethical fitness for bar admission.

The evidence is substantially uncontroverted. Mailath has been a practicing public accountant since 1975. He graduated from law school in 1980. The application presently before us, submitted in 1986, was for the February 1987 bar examination.[9]

In 1981 the bar applicant began to expand his professional horizons. Through clients, friends and acquaintances he was introduced to prospective clients and business associates in need of a good accountant—one astute in the tax field who could assist in decreasing their liability. In the midst of his growing practice, he took a serious interest in the commercial real es-

---

6. *Willner v. Committee on Character and Fitness, supra* note 4, 373 U.S. at 107, 83 S.Ct. at 1182 (Goldberg, J., concurring).

7. Mailath's March 9, 1987 letter to the Board states:

"I wish to schedule my hearing no later than Saturday, May 16, 1987. Please contact Ms. Nelson to schedule accordingly. Please furnish your witness list as soon as possible. I will likewise furnish my list to you within three to four days after receiving your list. I will be retaining counsel in the next few weeks but I will continue to be chief counsel (Pro Se) throughout this proceeding. If you

have any questions please contact me as soon as possible."

8. See *Willner v. Committee on Character and Fitness, supra* note 4, 373 U.S. at 109, 83 S.Ct. at 1183; *Appeal of Evinger,* Okl., 629 P.2d 363, 368 [1981]; *State v. Trower,* Okl., 381 P.2d 142, 143 [1963].

9. The applicant had two previous opportunities to take the bar examination—once in the summer of 1980 and again in the spring of 1981. The Board allowed him to take the February 1987 examination but did not disclose the results.

tate market and began forming partnerships for the purchase or development of several kinds of business property. Between 1981 and 1984 he was instrumental in forming over a dozen partnerships.

Most of the agreements were drafted by Mailath. They followed the same basic format. He paid no money for his partnership interests but was obligated to contribute his expertise in accounting, finance, and development. Usually included as a partner was a certain loan officer whose bank financed many of the ventures, some of them *in toto.*

Whatever prosperity the partnerships may have initially bestowed upon the partners, financial hardships quickly followed. Mailath and his enterprises were eventually plagued not only with cash-flow problems but also with the imminent threat of foreclosures. The methods Mailath used in his attempt to solve the financial woes form the very foundation for the Board's decision to refuse him admission by examination.

### A.

### THE BAR APPLICANT'S CONDUCT AS A PUBLIC ACCOUNTANT *VIS–A–VIS* TWO OF HIS CLIENTS

#### (1)

One of Mailath's clients was a general surgeon who scarcely had time to monitor his own financial affairs. He left that task in the hands of his accountant in whom he had immense trust. Mailath had come to him with high recommendations. He deeply respected the bar applicant partly because of Mailath's academic achievement in law. This client knew Mailath did not "practice law" because, as Mailath put it, he preferred to practice as a CPA.

The bar applicant began giving his client "tax advice" by recommending that he "invest" in one of the partnerships he had previously created, Woodland Pointe. He did so in March of 1982 by purchasing Mailath's and another person's 2½% interests for $25,000.00. After becoming a

partner, the client began worrying about the possibility that he may have become liable for obligations incurred by the entity prior to his contribution. Mailath alleviated this client's concerns by sending him a letter stating, "I hold you harmless for everything up to the time you participated."

The Woodland Pointe agreement was amended each time an interest changed, once before and four times after the client became a "5% owner." While Mailath sold portions of his own interest to "new partners," the client was never given an opportunity to do the same. As managing partner who controlled the day-to-day business activity, Mailath had both a legal and ethical duty to share *equally* with the other partners in all opportunities for profit.[10]

The client was later induced by Mailath to contribute $60,000.00 to help form a general partnership called Tulsa Turnpike West. The object of that enterprise was to purchase, renovate and operate a local motel. Although the partnership agreement included the price of the property and the amount of cash needed to complete the sale, it did not reveal that Mailath and his bank-officer partner were to receive from the seller a $100,000.00 "finder's fee" to be paid at closing. The payment of this fee, equally divided by its two recipients, was concealed by Mailath from his client.

Eventually the client became associated with eight of Mailath's partnerships. He was never told of the risks connected with his partner status or the ventures themselves. While several of the partnership agreements required each participant—including Mailath—to make *cash* contributions in proportion to their interest, Mailath never made any. On one occasion the client asked whether he should have a pension and profit sharing plan for himself. The bar applicant advised him he was "better off" putting his money in the partnerships ... they were "better deals."

In the latter part of 1983 Mailath sought additional funding for a partnership known as Fox Hollow. Without the knowledge or consent of the client, Mailath presented to

---

**10.** *Cobb v. Whitney,* 124 Okl. 193, 255 P. 577, 579 [1927].

a prospective lender his client's financial statement which Mailath had prepared as his accountant. The bank granted the loan on the condition that the note be signed by each partner individually. The bar applicant obtained the client's signature when, on bringing a large "bunch of papers," he met him at a hospital for less than five minutes between surgeries. His client-partner had no time to examine any of the documents in detail.

In November 1983 Mailath managed to get his client's signature on other promissory notes—one for $133,200.00 and another for $111,600.00—in order to obtain financing on the Fox Hollow project. That partnership was to have built two homes for sale. In April 1984 Mailath asked him to sign another note for $380,000.00 which purportedly consolidated previous indebtedness and was to have provided funds to build a third house. The following June the client signed yet another note for $230,000.00 which, as Mailath told him, replaced the $380,000.00 note following a sale.

Since the client's first involvement with the Fox Hollow partnership, he understood from the bar applicant that his contributory obligations as partner were limited to $600.00 per month. These payments, he was told, represented his share of the $3,000.00 monthly installments due on the notes. He faithfully performed until September 1984, when he received notice from the bank that the partnership had defaulted on notes totaling almost one million dollars.[11]

(2)

Another client of Mailath was a medical doctor who had a net annual income of about $55,000.00. He met his future accountant and financial consultant in early 1983. Already owing his 1982 federal income tax liability of $50,000.00, this client began receiving Mailath's financial advice on April 1, 1983. The bar applicant suggested that the client satisfy in full the prior tax liability with the loan proceeds from a bank—one with which Mailath had "connections." The contact was Mailath's bank-officer partner.

The doctor was instructed by the banker to open an account by depositing with the bank the $60,000.00 he had in a savings account at another institution. The transfer was necessary before his "credit" for the loan could be "approved." The new account was opened.

As a means of solving this client's overwhelming "tax problems," Mailath strongly recommended he invest $26,375.00 for a 10.5% interest in one of Mailath's partnerships, Woodland Pointe. Although the client wished to purchase only a 2.5% interest, he was induced to commit himself to the greater amount when Mailath explained that a friend of that client, another doctor,[12] had already invested in the enterprise. The bar applicant advised that purchasing the 2.5% share was not enough—a greater tax advantage would be assured with a 10.5% interest.

Following Mailath's advice, the doctor borrowed $26,375.00 from his new banker and in August 1983 became a general partner in Woodland Pointe. Three months later he was approached by his accountant who is quoted as having said: "I've got some papers for another investment. You don't have to put any money in this one because you already have some equity in your first investment." Mailath had him sign an undated "rough draft" of a document that contained several blank spaces and subsequently made him a *general partner* in the Woodland Pointe West, a *limited* partnership. While Mailath never explained the difference between the status of a general and a limited partner, he did tell his client at an earlier occasion that he would make him a limited partner.[13]

**11.** Judgments for the partnership debts were taken against this client. After having lost his entire $120,000.00 contribution, he was driven into bankruptcy, with a remaining liability to the Internal Revenue Service estimated at $250,000.00.

**12.** The other doctor to whom Mailath referred is the surgeon whose experiences with the bar applicant are discussed in Part II–A–(1) of this opinion.

**13.** The client under discussion is not a native of the United States. Until he began dealing with

The following December Mailath drove to the client's home for an unexpected visit. Without having had any previous discussions about additional investment prospects, he enticed his client to contribute $30,000.00 to the Tulsa Turnpike West partnership (the motel project discussed earlier in Part II–A–(1) of this opinion, from which Mailath received the undisclosed "finder's fee"). When by this time the client had no money left in his bank account, Mailath convinced him to get another loan from the bank in order to make the contribution. That personal indebtedness was secured by the accounts receivable of his medical practice.

In June 1984 the doctor, without making a cash contribution, became one of the partners in Woodland Pointe North. During another of his surprise house calls, Mailath brought the investment idea to his client's attention. "This time," he said, "you don't have to put in any money because you already have about $70,000.00 equity in your previous investments [with me]. This is a big deal that can really get you some kind of tax credit." The client obligingly agreed to participate.

By February 1985 this doctor-client found himself a defendant in several lawsuits that arose out of partnership debts exceeding two million dollars. His known tax benefits were a $26,000.00 federal tax refund for 1983 and another one of $14,000.00 for 1984.

## B.

## SUMMARY AND ANALYSIS OF THE BOARD'S EVIDENCE

As discussed earlier, the evidence illustrates the manner in which Mailath conducted himself toward only two of several individuals with whom he dealt. The record is replete with instances where the bar applicant actively placed his personal interest above that of the partnerships. He maintained virtually absolute control over them, and his partners were kept uninformed about financial disasters he knew to be imminent. Mailath led individuals, particularly his accounting clients, to believe not only that he had a pecuniary stake in each enterprise, but also that they would ultimately profit from their contributions.

The evidence strongly indicates that the bar applicant realized profits were not likely. On occasion he succeeded in hastily clothing his clients with partner status—under the guise of offering them tax-saving investment opportunities—just a few days before promissory notes were due. Financial institutions would usually renew partnership obligations and advance additional funds in reliance upon the cash contributions from the new partners as well as upon the strength of the personal assets they implicitly offered as security.

Mailath concealed facts that would likely have deterred his clients from becoming partners. He never fully explained to them the ramifications of partner status, even though he knew they were ignorant of the vital facts regarding potential liability. Equally damaging to the bar applicant—in our evaluation of his ethical character—is the persuasive evidence that he frequently misrepresented to prospective and current partners the true state of partnership affairs.

For as long as an enterprise continues, its partners owe each other the utmost duty of good faith and loyalty.[14] "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." [15] The evidence shows clearly

the bar applicant, he had little, if any, business experience.

14. *Oklahoma Company v. O'Neil,* Okl., 440 P.2d 978, 984 [1968]; *Anderson v. Whitener,* 127 Okl. 284, 261 P. 156, 160 [1927].

15. The quotation is from *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 [1928], where the court, speaking through Cardozo, C.J., eloquently addressed the essence of a fiduciary's duty:

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is un-

that Mailath, in his capacity as partner, breached his fiduciary duties. He took advantage of his position and disadvantaged his partners by secretly negotiating and receiving funds ("finder's fees") for his own personal gain. He kept virtually all of his partners ignorant of the serious financial troubles that plagued many of the partnerships.[16]

Notwithstanding the fact that most partners never even read the partnership agreements and promissory notes Mailath had them sign, the bar applicant was in no position to treat and deal with them as though they stood at arm's length.[17] He was "[a] trustee ... held to something stricter than the morals of the market place."[18] He led them to believe that he had as much money at stake as they did, when in fact he placed no funds of his own at risk. Playing upon their ignorance and in breach of his duties as a fiduciary, he made his clients partners, free of charge, for the primary purpose of shifting liability away from himself and onto their trusting shoulders. Throughout the relationship he collected cash for his services while recklessly leading others to financial ruin.

■ A state may require a bar applicant to demonstrate those qualifications which are reasonably related to fitness for the practice of law.[19] Considering the bar applicant's conduct as partner, we must find his ethical value system extremely questionable at the very least. The degree of loyalty required of a lawyer to his client is even greater than that owed among partners; both personal as well as professional ethics are imperative for bar admission.[20]

■ Evaluating the evidence in light of *all* the roles in which Mailath acted leaves no doubt that he lacks the requisite ethical qualifications for bar admission. Mailath was the personal accountant of at least five individuals who eventually became his partners. He acquired their profound confidence and absolute trust as a result of that pre-existing professional fiduciary relationship. His clients, especially those who had no business or investment experience, were completely dependent upon his advice. He assumed—*vis-a-vis* those clients—the role of accountant, financial advisor, promoter, broker, and, to a limited extent, lawyer,[21] while ignoring completely the highly obtrusive conflicts of interest. The bar appli-

bending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." [Emphasis added.]

16. Under the terms of each partnership agreement, Mailath was entrusted with complete charge of the books and documents. He usually received a monthly fee of $500.00 from each. While all partners were afforded access to those records, none of them ever checked on Mailath's work until they began to suspect fraud or were sued by partnership creditors for what the partners perceived as unexpected and shocking levels of partnership debt. At this point Mailath became extremely uncooperative. Subpoenas were often required to obtain access to the records, and even then he never fully complied.

17. Mailath argues his clients were "sophisticated businessmen" who knew exactly what they were doing. The maxim *caveat emptor* does not apply in the context of a fiduciary relationship.

18. *Meinhard v. Salmon, supra* note 15.

19. See *Konigsberg v. State Bar of California,* 366 U.S. 36, 45–46, 81 S.Ct. 997, 1004, 6 L.Ed.2d 105 [1961]; *In re Anastaplo,* 366 U.S. 82, 90, 81 S.Ct. 978, 983, 6 L.Ed.2d 135 [1961] and *Konigsberg v. State Bar of California,* 353 U.S. 252, 273, 77 S.Ct. 722, 733, 1 L.Ed.2d 810 [1957]. See also, *Louisiana State Bar Association v. Hinrichs,* 486 So.2d 116, 119 [La.1986].

20. *In re Bond,* 168 Okl. 161, 31 P.2d 921, 922 [1934].

21. An accountant can advise his clients on whether *an* investment need be made and whether a particular kind would be more beneficial than another, depending on the client's financial condition. An investment advisor helps a person choose *where* his money will actually go, after evaluating the risks. A promoter tries to sell what *he* has chosen to the exclusion of other options. A broker can secure the choice and arrange the transaction. Last, but not least, lawyers can examine the legal consequences and render advice on potential liability. The bar applicant thrived on his clients' belief that he could properly act on their behalf in *all* of those capacities simultaneously.

cant knew some of his clients naively equated his experience as a law-school graduate with that of a seasoned licensed legal practitioner. It is also apparent from the record they relied on his professional *judgment* with the same degree of trust and confidence as that which one would normally place in a lawyer. Mailath's blatant insouciance toward basic tenets of personal ethics makes him a hazard to the public and hence unfit for admission to the bar.[22]

## III

## ANALYSIS OF THE BAR APPLICANT'S EVIDENCE

█ Mailath argues his license under the Oklahoma State Board of Public Accountancy is proof that he possesses the good moral character required of bar applicants. We disagree. While that factor is necessary to qualify him as a certified public accountant,[23] his CPA status *per se* is irrelevant to the issue whether he is eligible for admission to the Bar. The answer to that question depends upon facts relevant to the applicant's personal and professional character.

Thirteen witnesses testified on the bar applicant's behalf. Most of them knew him only as their accountant who did a good job. Two of his witnesses did invest in his business ventures. The first contributed $60,000.00 just before rental income from partnership properties fell drastically. The losses to that witness totalled $72,000.00 ($12,000.00 were paid to satisfy partnership tax and other liabilities). The witness attributed these misfortunes to poor economic conditions.

The other witness who was involved with a Mailath enterprise was not a client of his. This witness alone testified that he believed Mailath committed no improper acts. The partnership in which he was involved purchased land from him for $230,000.00. He was also able to sell part of his interest to one of Mailath's clients.

The remaining witnesses were all lawyers whose knowledge of the bar applicant was limited to the time they spent with him preparing his legal defenses in several lawsuits.[24] One of these witnesses would not even concede that Mailath owed one of his client-partners any fiduciary duties.

█ As for the evidence showing he secretly collected "finder's fees" from vendors, the bar applicant explains that such compensation is commonly accepted by persons who "put the transaction together." [25]

Because Mailath's actions with respect to the partnerships and his clients took place several years ago, he argues that he has been rehabilitated and that only his *present* moral character should be considered. We do not agree. Evidence of an applicant's *prior* conduct may be considered in determining his ethical eligibility, so long as it is not unduly remote in time and hence rea-

---

**22.** See *State v. Ledbetter*, 127 Okl. 85, 260 P. 454, 465 [1927].

**23.** 59 O.S.Supp.1986 § 15.8.

**24.** Mailath was a named defendant in at least thirty-eight lawsuits arising out of his partnership transactions. He sought bankruptcy in 1986, listing debts that totaled over 16 million dollars; three complaints objecting to his discharge were filed.

**25.** Quoted in the bar applicant's brief is Art. 1 of Rule XIV, Rules of General Application, promulgated by the Oklahoma State Board of Public Accountancy. Its pertinent terms provide:

"A registrant who ... will issue a report on financial statements of a client ... *must be independent* with respect to such client in fact and appearance.

A. *Independence will be considered impaired if during the period covered by the financial statements* ... the registrant:

\* \* \* \* \* \*

(3) Had any joint closely-held business investment with the client [or] ...

B. \* \* \*

(1) Was connected with the client as a promoter ... or in any capacity equivalent to that of a member of management...." [Emphasis added.]

Mailath *admits* he failed to maintain the requisite independence and contends that since his partnerships were "closely-held business investments", the fiduciary relationships with his clients were severed. There is no evidence he ceased acting either as their accountant or partner at any relevant time. He was hence not relieved of fiduciary status as a result of any transaction.

sonably relevant to show the present state of his character.[26] The record proof adduced against Mailath meets the requisite standards; it clearly proves his lack of ethical fitness at the time of his quest for admission. This bar applicant cannot be viewed as having been rehabilitated. He never acknowledged or conceded any of his conduct was improper.[27] Only once did Mailath obliquely express sympathy for all that his former clients and partners endured—he said he was sorry they fell victim to economic realities.[28]

## IV

### SUMMARY

Consistently with the *Willner*[29] notice standards, the Board must, after today, disclose to *all* bar applicants rejected for ethical unfitness the reasons for refusing them admission. Rule 11, § 1, Rules Governing Admission to the Practice of Law in the State of Oklahoma,[30] is accordingly modified to provide the enhanced notice.

 The record is found devoid of evidence that Mailath possesses the attributes of honesty and integrity which are essential for admission to the bar. *Strong and unswerving commitment to the value of fiduciary loyalty is a sine qua non of the personal characteristics lawyers must have.*[31] Mailath clearly failed to demonstrate the presence of that commitment. In the best interest of the public, his application must stand denied for want of ethical qualifications.

Rejected applicant refused admission by examination.

26. *Appeal of Evinger, supra* note 8 at 367.

27. See *Appeal of Estes*, Okl., 580 P.2d 977, 980 [1978].

28. Mailath's counsel explained at the hearing that many people were induced to venture with the bar applicant, because he simply "built a little better mousetrap." Under our review of the record, no "traps" were needed. Many investors had already fallen prey to Mailath's scheme of keeping his clients in a state of ignorance and dependency attended by false hopes.

29. See the text accompanying note 5, *supra.*

30. See *supra* note 3.

DOOLIN, C.J., and HARGRAVE, V.C.J., and HODGES, LAVENDER, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

31. Lawyers may be disciplined for misconduct in breach of a fiduciary duty toward a *non-client* for whom they acted in a trust relationship. See *Sodikoff v. State Bar of California*, 14 Cal.3d 422, 121 Cal.Rptr. 467, 471, 535 P.2d 331, 335 [1975], where the court addressed the standard of conduct as follows:

> "When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."