**In the Matter of the Application of Jerry Jean SANGER for Admission to the Oklahoma Bar Association.**

**SCBD No. 3914.**

Supreme Court of Oklahoma.

Dec. 7, 1993.

Fenton R. Ramey, Yukon, for Bar applicant.

Patrick H. Kernan, Tulsa, for Oklahoma Bd. of Bar Examiners.

OPALA, Justice.

Jerry Jean Sanger [applicant or Sanger] seeks admission as a licensed lawyer. He graduated from law school in 1992 and *passed* the bar examination the same year. The Oklahoma Board of Bar Examiners [Board] *denied* his admission *for failure to meet the ethical fitness* required by Rule 1.[1] In the March 12, 1993 evidentiary inquiry held pursuant to Rule 11,[2] during which Sanger was represented by counsel, Sanger failed to satisfy the Board that he is ethically fit to practice law.[3] *He now seeks relief from the Board's rejection.*

Three issues are presented: (1) When making a fitness-to-practice-law decision, may the Board consider circumstances which arose during an Oklahoma Bar Association [Bar] attorney-grievance proceeding? (2) Was the applicant denied due process?[4] and if not, (3) Does our *de novo* review reveal the applicant to be ethically fit for admission? To the first question we give an affirmative answer; to the second and third, we reply in the negative.

## I.

## THE ANATOMY OF THE PROCEEDINGS

Arnold Fagin [Fagin], an Oklahoma City lawyer, represented Sanger in March 1991 in

---

1. Rule 1 § 1, Rules Governing Admission to the Practice of Law in the State of Oklahoma, 5 O.S.1991, Ch. 1, App. 5. The pertinent terms of Rule 1 are:
 "To be admitted to the practice of law in the State of Oklahoma, the applicant:
 "Section 1. Shall have good moral character, *due respect for the law*, and *fitness to practice law....*" [Emphasis supplied.]

2. Rule 11, Rules Governing Admissions to the Practice of Law in the State of Oklahoma, 5 O.S.1991, Ch. 1, App. 5, provides for *post-rejection notice and hearing* when an applicant is denied admission for lack of *ethical qualifications*. For Rule 1's pertinent terms, see *supra* note 1. The pertinent terms of Rule 11 are:
 "Section 1. Should the Board of Bar Examiners ... refuse to recommend any applicant for admission to practice on any ground except failure to pass the bar examination, then a written notice shall be mailed to such applicant stating the section ... *under Rule One* upon which the refusal is based. The notice must adequately inform the applicant of the nature of the evidence against him, although the Board need not list every item and source of information upon which it relies in rejecting the applicant....
 "Section 2. In the event the applicant wishes to take issue with the Board's decision, applicant shall be entitled to a hearing before the Board by delivering a written request for a hearing to the Board within twenty (20) days after the notice of refusal has been mailed to the applicant. The applicant shall have the right to be represented by counsel, and present evidence, at the time and place fixed by the Board for the hearing. * * * " [Emphasis supplied.]

3. The pertinent terms of Rule 11 § 7, Rules Governing Admission to the Practice of Law in the State of Oklahoma, 5 O.S.1991 Ch. 1, App. 5., are:
 "The *burden* of establishing eligibility for *admission* to the Bar of this state ... shall rest on the *applicant* at *all stages of the proceedings.*" [Emphasis supplied.]

4. The applicant was advised that although he had passed the bar examination, his bar admission would be withheld pending further investigation of his ethical fitness. On October 30, 1992 the Board took the applicant's deposition. He was then notified his application for admission had been denied. A Rule 11 hearing was held March 12, 1993. Sanger *does not complain of inadequate notice of the *reasons* for the denial of his application *in ample time to prepare for the Rule 11 hearing.* See in this connection the discussion in Part III and in *Mailath, infra* note 20 at 805.

a postdecree custody dispute.[5] Sanger (a) paid Fagin a $2,000 "non-refundable retainer", (b) signed a fee agreement and (c) incurred—in the pretrial stage—additional attorney's fees of $1,535.00. Sanger became unhappy with Fagin's representation (and with the amount it was costing) and settled the case himself. His wife not only retained custody of their child, but Sanger's access by visitation was curtailed. Sanger also (a) gave up an expensive leather chair, (b) assumed the responsibility of a disproportionate share of travel for visitation and of expenses connected with transporting the child and (c) agreed to pay more child support.

On February 3, 1992 Sanger filed with the Bar a grievance against Fagin, included in which were allegations that (a) Fagin had agreed to seek for him *temporary* custody of his son, (b) Fagin instead sought not only temporary but also *permanent* custody and, when asked to withdraw the latter quest, he *refused* to do so and (c) the fee agreement, signed under duress, is void for failure of consideration. Sanger indicated on the grievance form that a similar complaint was pending in district court.[6]

Gloria Miller White [White], Asst. General Counsel[7] for the Bar, notified Sanger that his grievance did not warrant investigation since it appeared to be no more than a fee dispute.[8] Later, after a telephone conversa-

tion with White, Sanger filed an amended grievance to which he attached what he represented to be copies of handwritten notes, made contemporaneously with the occurrences they described. He stated that the notes had been mailed to Fagin "on several occasions" and they were "returned to [him] at his request after the case was concluded." [9]

The Bar forwarded a copy of the amended grievance to Fagin for a response. Fagin, who had retained a copy of notes Sanger had given him during the custody proceeding, denied all of Sanger's allegations. He also (a) pointed out discrepancies in the two sets of notes, (b) suggested that Sanger had altered the writings to bolster his grievance and (c) urged the Bar to report Sanger to the Board. Months passed. After Sanger had taken the bar examination, White and an investigator for the General Counsel's office confronted Sanger with two different versions of one page of the notes (3(b) and 3(f)), but the matter was not then resolved. The General Counsel advised Sanger to retain counsel, which he did. After Sanger had given the Bar a written explanation for the discrepancies in the two versions, the General Counsel's office continued its investigation and then turned its product over to the Board. The Board took Sanger's deposition.[10] Sanger was notified on February 16,

---

**5.** Sanger sought a *postdecree* change in custody because his young child complained that his mother's boyfriend had *hit him in the stomach with his fist.*

**6.** Judgment was given to Fagin in a district court suit (in small claims division) for the balance owing him for attorney's fees, and Sanger's counterclaim for fraud was dismissed.

**7.** The Bar's General Counsel is its *investigative arm. See* the terms of Rule 3.2(b), 5 O.S.1991 Ch. 1, App. 1–A, which assign to the General Counsel the duty "[t]o investigate all matters involving possible misconduct or alleged incapacity of any lawyer called to the General Counsel's attention by complaint or otherwise...."

**8.** Unless the amount demanded or charged is *fraudulent or extortionate, the Bar Association does not become involved* in *fee disputes. See* Rule 1.4(d), Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. I–A, which provides:
"Controversies as to the *amount of fees* shall *not* be considered a basis for *charges in a*

*disciplinary proceeding unless* it is made to appear that the amount demanded is *extortionate* or *fraudulent."* [Emphasis supplied.]

**9.** The pertinent part of the amended grievance is:
"I have enclosed copies of *all hand written notes which I made contemporaneously with these occurrences.* I *mailed these notes,* on several occasions, *to Mr. Fagin's office. The notes were returned to me* at my request after the case was concluded. *I apologize for the condition of these notes. I did not anticipate the notes would be used for such a purpose, and was not as neat and orderly as may have been possible."* [Emphasis supplied.]

**10.** Rule 12, Rules Governing Admissions to the Practice of Law in the State of Oklahoma, 5 O.S.1991 Ch. 1, App. 5, provides in pertinent part:
"In determining the right of any applicant to admission, the Board of Bar Examiners shall have the power to make such *independent investigation* and require such additional showing as it may deem proper...." [Emphasis supplied.]

1993 that his application for admission to the Bar had been denied. Following a Rule 11 hearing the Board concluded that the applicant does not meet the Rule 1 requirements for ethical fitness to practice law. This proceeding for *de novo* review followed.

## II.

## RULE–BASED PRIVILEGE AND IMMUNITY FROM CIVIL LIABILITY FOR FILING GRIEVANCES AGAINST LAWYERS DOES NOT SHIELD AN APPLICANT FROM BOARD INVESTIGATION INTO HIS ETHICAL FITNESS FOR ADMISSION TO THE BAR

■ The bar applicant urges the terms of Rules 5.4[11] and 14.1[12] give him "absolute judicial immunity" from the Bar's adverse use of any circumstances brought to light in the course of a grievance proceeding. The applicant relies upon authority from other jurisdictions showing that a grievant *is protected from civil liability to an attorney against whom he has brought a grievance.*[13] Jurisprudence which shields a grievance bearer from civil liability is inapposite in the case before us. Here the applicant seeks to exclude the Board's use of information—gained during the grievance process—which reflects adversely upon his fitness to become an officer of the court. Our search has yielded *no* authority that affords immunity in the context here in controversy.

■ Our rules *do not grant the broad protection applicant would invoke for himself.* At most the rule-based shield which the applicant urges today is coextensive with the common-law privilege extended to attorneys, parties and witnesses with respect to communications made *preliminary*[14] to judicial or quasi-judicial proceedings.[15] While Sanger

11. The terms of Rule 5.4, Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. 1–A, provide:
 "*Matters contained in grievances* submitted to the Association, the Commission or the General Counsel, and statements, oral or written, with respect thereto, *shall be privileged. Litigation or the threat of litigation by a respondent lawyer against a person filing a grievance by reason of such filing may be grounds in itself for discipline.*" [Emphasis supplied.]

12. The terms of Rule 14.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. 1–A, are:
 "The members of the Professional Responsibility Commission, the Board of Governors of the Association, the Professional Responsibility Tribunal, the Officers of the Association, the General Counsel of the Association, the staff employed by the Association and the General Counsel of the Association, in acting in connection with the enforcement of these Rules, *and all others (whether or not members of the Association) whose assistance is requested by any of the foregoing in connection with the enforcement of these Rules*, shall be considered as acting officially on behalf of the Supreme Court of the State of Oklahoma, and shall enjoy *immunity from civil liability to the fullest extent recognized by federal and state law.*" [Emphasis supplied.]

13. The applicant cites *Jarvis v. Drake*, 250 Kan. 645, 830 P.2d 23, syllabus 1 (1992) (where absolute immunity was granted a bar complainant in a lawyer's claim for malicious prosecution, libel and tortious interference with contract) and *Ramstead v. Morgan*, 219 Or. 383, 347 P.2d 594, 596 (1959) (where absolute immunity was upheld in an attorney's libel claim arising from the client's letter to a bar grievance committee); *see also Sinnett v. Albert*, 188 Neb. 176, 195 N.W.2d 506, 508 (1972); *McAfee v. Feller*, 452 S.W.2d 56, 58 (Tex.Civ.App.1970).

14. Our statutes provide a similar privilege for communications made *during* a judicial proceeding. *See* 12 O.S.1991 § 1443.1. *See also Pacific Employers Ins. Co. v. Adams*, 196 Okl. 597, 168 P.2d 105 (1946); *Hughes v. Bizzell*, 189 Okl. 472, 117 P.2d 763, 765 (1941); *Hammett v. Hunter*, 189 Okl. 455, 117 P.2d 511 (1941); *Sanford v. Howard*, 185 Okl. 660, 95 P.2d 644 (1939). The pertinent terms of § 1443.1 are:
 "A. A privileged publication or communication is one made:
 First. *In any ... judicial proceeding* or any other proceeding authorized by law;

 \* \* \* \* \* \*

 B. No publication which under this section would be privileged *shall be punishable as libel.*" [Emphasis supplied.]

15. *See Kirschstein v. Haynes*, Okl., 788 P.2d 941, 947–948 (1990), where this court adopted the RESTATEMENT (SECOND) OF TORTS standards that create an absolute privilege for communications of attorneys, parties, and witnesses made *preliminary to proposed judicial or quasi-judicial proceedings. See* RESTATEMENT (SECOND) OF TORTS §§ 586, 587 and 588 and the comments to those sections. Section 587 states:
 "A party to a private litigation or a private prosecutor or defendant in a criminal prosecu-

would no doubt be protected from liability if Fagin brought against him a defamation claim or one for intentional infliction of emotional distress,[16] the invoked rules cannot shield Sanger from an investigation [17] of his ethical fitness for admission to the Bar.[18] *The applicant's claim to rule-based privilege or immunity must hence be denied.*

### III.

### THE APPLICANT WAS *NOT* DENIED DUE PROCESS

■ State bar admission process is protected by federal due process standards. In *Willner v. Committee on Character and Fitness,*[19] the United States Supreme Court declared a rejected bar applicant is entitled to notice of the reasons upon which his lack of the requisite ethical fitness was rested and to a meaningful post-rejection opportunity in a timely requested hearing to prove himself qualified. This court implemented the mandatory *Willner* standards by adopting Rule 11. Its *Mailath* [20] message insists on the Board's faithful compliance with the teachings of *Willner.*[21]

> tion is absolutely privileged to publish defamatory matter concerning another *in communications preliminary to a proposed judicial proceeding,* or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates, if it has some relation to the proceeding." [Emphasis supplied.]
> Sections 586 and 588 similarly protect attorneys' and witnesses' publications made preliminary to judicial proceedings.

16. *Kirschstein,* supra note 15 at n. 9, teaches that an absolute privilege from *civil liability* for libel and slander has been applied to *communications arising from attorney disciplinary proceedings.*

17. The Bar's duty to protect the public by investigating *an attorney's* involvement in suspect circumstances is *not* confined to *formal* complaints. In *State Ex Rel Okl. Bar Ass'n v. Raskin,* Okl., 642 P.2d 262, 265 (1982), a lawyer complained that the Bar undertook to investigate his embezzlement from a client *without a formal complaint* having been filed. The court said: *"[T]he Bar's responsibility to investigate a charge as serious as commingling or misappropriation does not depend upon the receipt of an injured client's plea for imposition of discipline. The shield of protection would indeed rest on a frail basis if the Bar's power to proceed against a dishonest lawyer were*

Applicant complains that (a) on April 24, 1992, Fagin told the Bar that Sanger's grievance was fraudulent and that the Bar should file a complaint with the Board, (b) soon after the documents' receipt, the Bar apparently felt Sanger was furnishing altered notes and (c) the Bar waited until August to confront him with two different versions of one page. He urges that this initial confrontation took place *before* he was advised to hire counsel. The Bar *never* told him he was the focus of its investigation.[22] Although the applicant broadly blames his admittedly wrong and inconsistent explanations for the notes' discrepancies *upon passage of time and lack of legal advice,* he fails to identify a precise due process flaw. In short, *Sanger cites no authority to support a constitutional infirmity in the process that was applied. Our independent research does not reveal any violation of Sanger's protected rights.*

■ In support of Sanger's fitness for admission to the bar he presented six character witnesses (four appearing in person and two offering testimony by affidavit), the opinion of an expert document examiner, and his own testimony. His counsel, who was well prepared, thoroughly cross-examined the wit-

> *to depend on the injured party's complaint."* [Emphasis supplied.]

18. Neither could the rules protect Sanger from police inquiry into some criminal conduct. *See,* e.g., *Bryson v. Tillinghast,* Okl., 749 P.2d 110, 112–113 (1988), where this court refused to extend the *doctor-patient privilege* to cover *voluntary extra-judicial divulgence to the police of information revealing the commission of a crime.*

19. 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

20. *Application of Mailath,* Okl., 752 P.2d 803, 805 (1988); *In re Application of Owens,* Okl., 863 P.2d 1133 (1993). *See also State v. Miskovsky,* Okl., 824 P.2d 1090, 1099–1100 (1991).

21. In *Mailath, supra* note 20 at 805, we enlarged upon the text of Rule 11 by *requiring* that the Board give applicants pre-hearing notice that would *"adequately* inform [them] of the *nature* of the evidence against [them]."

22. Applicant fails to explain why he was unable to infer from the Bar's advice to obtain counsel that the focus of its investigation had indeed shifted to him.

nesses for the Board and presented evidence in his client's defense. *On de novo review, we conclude and hold that the record does not show any remedial infirmity*[23] *which would entitle Sanger to corrective relief on his lack-of-due-process argument.*

## IV.

## THIS COURT MUST GIVE *DE NOVO* CONSIDERATION TO THE BAR APPLICANT'S QUEST FOR ADMISSION

■ In a proceeding to review the Board's decision that an applicant lacks ethical fitness to practice law this court will examine the entire record tendered and, *if it is complete, as it is in today's case,*[24] will consider *de novo* the applicant's quest for admission.[25] Our task today is to be distinguished from two other remedial notions with which it is easily confused: *de novo appellate* review on the record and a trial *de novo.*

The latter denotes a retrial of an entire case before a different tribunal, with *all* litigable issues standing as though they had never been resolved.[26] The former—*de novo appellate* review on the record—requires an independent, non-deferential examination of *another tribunal's record.*[27]

■ The distinction between our *de novo* review that is a rejected bar applicant's constitutional due and the other two forms of process is that this court's bar jurisdiction is nondelegable.[28] *Every aspect of the Bar's adjudicative process, from its beginning to the end, is an exercise of this court's original and exclusive constitutional cognizance over lawyers as well as over those who seek bar admission.*[29] Since this power cannot be *shared* with any other institution,[30] *the entire process* must be given our *de novo* consideration.[31] Stated another way, since the findings of fact made by the Board[32] are neither

23. Neither party has cited any law requiring the Board's *pre-denial procedure* to be *adversary* or structured by any *rules.* A witness for the Board testified that if Sanger had been a lawyer rather than a law student, a different *procedure* would have been followed. This is, of course, axiomatic. *A bar applicant is not entitled to an adversary pre-rejection proceeding, only to ample notice of reasons for being rejected and to an adversary post-rejection hearing.* See Rule 11, *supra* note 2; *Mailath, supra* note 20, 752 P.2d at 805. For the Board's investigative powers, *see* Rule 12, *supra* note 10.

24. Although the proof to be reviewed is *never* to be deemed *settled beyond this court's power to order that it be expanded,* no additional evidence is needed for today's review.

25. *See Willner, supra* note 19 at 373 U.S. 109, 83 S.Ct. 1183; *State v. Carpenter,* Okl., 863 P.2d 1123 (1993); *Appeal of Evinger,* Okl., 629 P.2d 363, 368 (1981); *State v. Trower,* Okl., 381 P.2d 142, 144 (1963).

26. *See Shelton v. Lambert,* Okl., 399 P.2d 467, 470 (1965); *see also Globe–Union, Inc. v. Chicago Telephone Supply Co.,* 103 F.2d 722, 728 (7th Cir.1939).

27. *Brown v. Burkett,* Okl., 755 P.2d 650, 651 (1988); *Globe–Union, supra* note 26 at 728; *Niehaus v. Madden,* 348 Mo. 770, 155 S.W.2d 141, 145 (1941); *see also* Art. 9 § 20, Okl. Const.; *Atchison, Topeka & Santa Fe Ry. Co. v. State,* Okl., 692 P.2d 554, 555–556 (1984).
The pertinent provisions of Art. 9 § 20, Okl. Const., are:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and *in all appeals involving in [sic] asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. * * *"* [Emphasis supplied.]

28. *See In re Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113 (1939) (the court's syllabus); Raskin, *supra* note 17, 642 P.2d at 265–266. *See also* the discussion in *State Ex Rel. Oklahoma Bar Ass'n v. Perceful,* Okl., 796 P.2d 627, 631 (1990) (Opala, J., dissenting).

29. *See* the authorities cited *supra* note 28.

30. *Delegata potestas non potest delegari*—delegated power may not be redelegated. *American Home Products Corporation v. Homsey,* Okl., 361 P.2d 297, 301–302 (1961).

31. *Mailath, supra* note 20, 752 P.2d at 806.

32. The Board's findings and conclusions are:

On February 3, 1992, the applicant filed a complaint with the Oklahoma Bar Association against Arnold D. Fagin, an attorney in Oklahoma City. Mr. Fagin had previously represented the applicant in a domestic matter. On March 2, 1992, the Oklahoma Bar Association (OBA), through its counsel, advised the applicant that his complaint against Mr. Fagin was essentially a fee dispute and the Bar declined

binding nor persuasive here, this court must pass on the sufficiency and weight of the evidence as a tribunal of first instance. *The burden rests upon the applicant to show himself entitled to the relief sought.*[33]

■■■ Clear and convincing record proof accords with the material findings of the Board that the applicant is ethically unfit for admission to the Bar. Although six witnesses testified (two by affidavit) that in their opinion the applicant is a person of good character, none of the applicant's witnesses (including his present wife) knew anything about the incidents which, in the course of the grievance proceedings, had called his veracity into question.

When Sanger filed his amended grievance, he told the Bar that he was sending them copies of his original notes made contemporaneously with the events that had transpired, clearly stating that they were papers which had *initially been sent to Fagin and returned.*[34] The applicant admits this is not true, but defends his misstatements on the ground that he only repeated what White had instructed him to say for purposes of his grievance. This argument affords no ground for excuse. An applicant should have the integrity to tell the truth, despite any instructions he might have received about the genre of grievance which would be likely to gain the Bar's attention. The applicant alone

to pursue the matter further. Thereafter, on or about March 30, 1992, the applicant filed with the Bar an amended complaint against Mr. Fagin and in support thereof attached copies of fifteen (15) pages of handwritten notes which he represented to the OBA to have been made contemporaneously with the events mentioned in the notes. Nine (9) original pages of notes had been sent by the applicant to Mr. Fagin during the pendency of his domestic matter between April and August, 1991. When the domestic litigation concluded in September 1991, Mr. Fagin returned the original nine (9) pages of notes to the applicant but kept a copy for his file. After the applicant received back the nine (9) original pages of notes from Mr. Fagin, he took out two of those pages (pp 3(F) and 5(F) of Ex. 6), and substituted therefor two other handwritten pages (pp 3(B) and 5(B) of Ex. 4). The substituted pages contained additional information that directly supported Mr. Sanger's claim against Mr. Fagin with the OBA. The substituted pages were then submitted by the applicant to the Bar on March 30, 1992, as part of the fifteen (15) pages of "contemporaneous" notes. The Board finds that Mr. Sanger intentionally substituted the two (2) pages which contained additional information harmful to Mr. Fagin and submitted those pages to the Bar for the sole purpose of strengthening his claim against Mr. Fagin.

On August 14, 1992, the applicant was personally confronted with the two (2) versions of his handwritten notes at the Bar by Gloria White and Robert Hanks. The applicant told Ms. White and Mr. Hanks that he did not know why there were two (2) versions of this handwritten notes, that perhaps Mr. Fagin had "cut and pasted" his notes together, or that perhaps he [Sanger] had written out two (2) versions of his notes instead of using a copy machine. The Board finds that applicant was not truthful during this meeting with Ms. White and Mr. Hanks. After the applicant was provided with a complete set of both versions of his notes and

with Mr. Fagin's April 24, 1992 response letter to the Bar, the applicant on September 15, 1992 filed a memorandum with the Bar which attempted to explain *how* two (2) versions of the applicant's notes came about and *why* there were two (2) versions. The applicant admitted in his testimony on March 12, 1993 that the information in his September 15, 1992 memorandum was not truthful. The Board finds that the applicant's September 15, 1992 memorandum to the Bar contained information in paragraph number five thereof which was not truthful.

At the Rule 11 Hearing on March 12, 1993, the applicant testified that he did substitute two (2) pages of the original notes he had previously sent to Mr. Fagin but denied that he made the substitution of those two (2) pages for the purpose of strengthening his claim with the Bar against Mr. Fagin. The applicant further denied that he had intentionally misrepresented the history of the fifteen (15) pages of notes that he submitted to the Bar on March 30, 1992. The Board finds the applicant's testimony on these issues to be untruthful.

Based upon the above and foregoing findings, the Board concludes that the applicant, Jerry Jean Sanger, does not meet the requirements of Rule One, Section 1 of the Rules Governing Admission to the Practice of Law in the State of Oklahoma, which provides that an applicant shall have good moral character, due respect for the law, and fitness to practice law. The Board therefore affirms its previous decision of February 16, 1993 to *DENY* the application of Jerry Jean Sanger for admission to the Oklahoma Bar. [Emphasis in original; citations to Record omitted.]

33. Rule 11 § 7, *supra* note 2.

34. For the pertinent terms of the amended grievance, see *supra* note 9.

is responsible for his misrepresentations; he cannot shift the blame to White.

Sanger represents himself as the consummate notetaker who is (1) *continuously recopying notes to make them more accurate* and (2) *anxious to provide for the Bar the most complete and accurate version of his notes.* This self-characterization is inconsistent with his apology in the amended grievance for the "condition of these notes" and his statement that he "did not anticipate the notes would be used for such a purpose and was not as neat and orderly as may have been possible," all of which was undoubtedly intended to convey to the Bar the impression that he was sending the notes in their original and unaltered form rather than as corrected, recopied and augmented.

Sanger had (a) read Fagin's response to the bar grievance and (b) reviewed copies of pages 3(b) and 3(f) of the notes when he composed and transmitted to the Bar his September 15, 1992 detailed explanation for how and why two different versions of the notes had come from his pen. He was at that time represented by a lawyer. Sanger admits that his September 15 explanation [35] for the discrepancies contains untruths.[36] Pages one through nine of the notes that had been sent to Fagin [1(f)–9(f) ] had been written consecutively—i.e., none had been replaced *before* they were sent to Fagin as Sanger had claimed. Pages three and five of the notes Sanger sent to the Bar [3(b) and 5(b) ] also had been written consecutively on the same pad.[37] *Sanger had replaced pages 3(f) and 5(f) of the notes returned by Fagin with 3(b) and 5(b)* [38] *before he sent them to the Bar.*[39]

The applicant's testimony is both evasive and contradictory.[40] Although there are oth-

35. Sanger's counsel attempts to excuse the September 15 untruths by explaining that at the time the memorandum was written Sanger had seen only 3(f) and 3(b), rather than the complete packet of notes. Sanger was then represented by counsel; if he did not have sufficient information to respond to the Bar at that time, he should have followed a different course of action.

36. The September 15, 1992 memorandum, which a handwriting expert's analysis refutes as untrue, provides in pertinent part:

My brother Jordon T. Sanger practices family law in Denver, Colorado. Jordon had been working with me and giving me advice during the case which was before Judge Echols. Jordon mailed me a letter, a copy of which I am enclosing, giving me instruction to perform certain tasks. Note that Jordon had told me, in writing, to take daily notes, and send the notes to him. After several days of taking notes, with the intent of mailing them to Jordon, during a telephone conversation I asked if I should mail him the notes I had taken over the past several days, or wait until I had taken more notes. Jordon told me that he did not need to see the notes himself, and to mail the notes to Mr. Fagin. *I then recopied the first several days of notes, deleting portions which may have been offensive to Fagin, since his employment contract stated the $2,000.00 retainer fee I had paid him was non-refundable.* I did not include any comments to Mr. Fagin at any point during the case which may have agitated Mr. Fagin because of the fact that he stated in the contract that the $2,000.00 was non-refundable. I had no way of hiring another attorney at this point. *The notes I submitted to the Bar were the originals, and made the day of the happening of the events.*

I have moved from one house to another, taken a bar exam, graduated from law school, and my wife has had a new baby boy since these notes were taken. *I did not fully evaluate my file regarding the handwritten notes until after being presented with the recopied version of the notes which I had sent to Mr. Fagin. After having had an opportunity to review my file, I located the above mentioned letter from my brother Jordon, and recalled that I had recopied some of the notes before sending them to Mr. Fagin.* [Emphasis supplied.]

37. Sanger testified that his first-generation notes were made on various sheets of paper other than the pad, such as school notes or three-by-five cards. He would then transfer the notes onto the pad.

38. Although Sanger's handwriting analyst testified that entries on pages 3(b) and 5(b) had been written at different times, she admitted that she had not considered whether the writer may have intended to make the notes look as if they were written at different times to comport with the dates.

39. Sanger also sent the Bar six additional pages of notes which he did not send Fagin. One of the additional notes mentions that Fagin will file a motion to change custody *temporarily.*

40. Sanger testified on direct examination that he *"knows"* the pages 3 and 5 that were furnished to the Bar Association [3(b) and 5(b) ] were prepared "during, or soon thereafter, the litigation involving the custody matter," but that he has *no specific recall* of doing it. His *"best estimate"* is that they were prepared during the custody liti-

er minor changes, the *material additions* [41] in the substituted pages (3(b) and 5(b)) support Sanger's grievance against Fagin. There *is* clear and convincing evidence, not only that Sanger lied to the Bar on more than one occasion, but also that he intentionally substituted two pages of notes which contained additional information about Fagin and submitted them in order to bolster his grievance against Fagin.

## SUMMARY

 Persons who are ethically unfit must be refused bar admission to protect the public and the legal profession.[42] *Sanger blamed his multiple misrepresentations upon his desire to give the Bar an answer, even if the truth was that he didn't know the answer.* His willingness to fill voids with untruths would make him a hazard to clients,

to the general public, to courts and to the Bar as well. Our *de novo* review of the record convinces us Sanger has not shown that he possesses the attributes of *candor, integrity* and *honesty* which are *absolutely critical to* one's fitness as a licensed legal practitioner.[43]

## BAR APPLICANT REFUSED ADMISSION.

LAVENDER, V.C.J., and SIMMS, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

SUMMERS, J., not participating.

---

gation. They *"could have been prepared"* after Mr. Fagin returned his notes to him in September of 1991. That would have been within two weeks of their return.

On cross-examination Sanger testified that he *just doesn't remember* when he inserted the new pages 3 and 5; it could have been after his case was over or it could have been before. He agrees that it would *have had to be* after he got the notes back from Fagin. He does not know where the originals of 3(f) and 5(f) are. He has *no recollection* of throwing them away. He testified that when he pulled the notes out of his file to send to White, they were together and he doesn't recall how they physically came to be in one place. He then testified that *he prepared 3(b) and 5(b) before he got the notes back from Fagin. He prepared them because he intended to send notes to his oldest brother in Colorado with information about Mr. Fagin which he didn't want Mr. Fagin to read.*

**41.** *Compare* the material additions with the pertinent part of the amended grievance. The material addition to 3(b) is:

"3–22–91—9:05 a.m. . . . Got copy of motion to modify custody. It says *permanent change* not *temporary.*—Called Fagin & asked to *withdraw motion. We can't withdraw motion,* if we ask to the Judge will think we are trying to manipulate; she will think I should know better since I am a law student."

The material addition to 5(b) is:

"4–5–91 . . . [Hand] asked why I called Fagin instead of talking with Kaycee. I told him that she had said that Stephen would be better off if he never saw me again, etc. & that Stephen said Kaycee was there when Greg hit him. *I said that I called Fagin for a temp. chg. in custody so we could investigate Stephen's story."*

The pertinent part of the amended grievance states:

> In addition to misrepresentations in Mr. Fagin's billing, I would like to point out *two other issues* which may bear further investigation:
> 1. Mr. Fagin exceeded my directions regarding the scope of my representation. Mr. Fagin filed a motion to change custody *permanently* in contradiction to my approval of his filing a motion to change custody *temporarily;*
> 2. Mr. Fagin misrepresented the fact that he could not *withdraw the motion to permanently change custody* when I asked him to withdraw said motion on March 22, 1991.

**42.** *Matter of Evinger,* Okl., 604 P.2d 844, 845 (1979).

**43.** Sanger vows that he understands his errors and that, if admitted, he would never repeat his mistakes. Although the applicant has not shown the requisite ethical fitness for admission at this time, our rules permit one to reapply upon proof of rehabilitation. *See Appeal of Estes,* Okl., 580 P.2d 977, 979–980 (1978). The time for *reapplication* is fixed by Rule 13, Rules Governing Admission to the Practice of Law in the State of Oklahoma, 5 O.S.1991 Ch. 1, App. 5, which provides:

> "If the decision by the Board to deny an application is based, in whole or in part, on the failure of the applicant to demonstrate good moral character, *due respect for the law,* or *fitness to practice law,* the applicant may *not* reapply for admission within a period of *sixty months* next after the date of mailing the initial rejection notice pursuant to Rule 11, Section 1, unless for good cause shown, a shorter time period is ordered by the Board." [Emphasis supplied.]